# CASES

# COURT FOR THE CORRECTION OF ERRORS

---

## BLOODGOOD vs. THE MOHAWK AND HUDSON RAILROAD COMPANY.

Acts of the legislature authorizing *Railroad Companies* to enter upon, take possession of and use the lands and real estate of individuals for the construction and maintenance of their roads, as far forth as the same are indispensably necessary for that purpose, are *valid* and *constitutional* acts ; provided, that in and by the same acts, provision is made for the assessment and payment of the damages of the owner of the lands and real estate thus taken and appropriated.

It is enough that such provision be made ; it is not necessary that the *damages* or *compensation* should be *actually ascertained and paid*, previous to the appropriation of the property.

Where power was given to a Railroad Company to enter upon, take possession of, and use the lands of individuals in the construction and maintenance of their road, and the section granting the power contained a *proviso* that the lands so taken should be purchased by the company, and in case of disagreement as to price, that the damages of the owner should be appraised in a particular manner, *it was held*, in view of the constitutional prohibition to the taking of private property without making just compensation to the owner, that the *proviso* above referred to must be deemed a *condition precedent*, and that the plea of the company put in by them to a declaration in an action of trespass *quare clausum fregit* was imperfect, in not averring the assessment and payment of the damages previous to the entry upon the land and the appropriation of the same to the use of the company.

The *constitutional power* of the legislature to authorize *private corporations* to take the property of *individuals*, without their consent, for the construction of *railroads*, considered and discussed.

ERROR from the supreme court. The plaintiff declared in *trespass quare* [10] *clausum fregit*, alleging that the defendants by their servants entered his closes with carriages, &c., broke down and destroyed his fences, and dug and subverted the soil, &c. The defendants justified under their act of incorporation, *Statutes of 1826, p. 286, &c.*, by the seventh section of which act it is enacted "That the said corporation be and they are hereby authorized, by their agents, surveyors and engineers, to cause such examinations and surveys to be made, of the ground lying between the Mohawk and Hudson rivers within the aforesaid limits, prescribed by the *first* section of this act, as shall be necessary to determine the most advantageous route, place or places, for the proper line, course, road and way, whereon to construct their single or double railroad or ways ; and it shall be lawful for the said corporation to enter upon and take possession of and use, all such lands and real estate as may be indispensable for the construction and maintenance of their single or double railroad or ways, and the accommodations requisite and appertaining to them ; and may also receive, hold and take all such voluntary grants and donations of land and real estate as shall be made to the said corporation, to aid in the construction, maintenance and accommodation of

---

(a) S. C., 14 Wend., 54.

Bloodgood *v.* The Mohawk and Hudson Railroad Company.

their single or double railroad or way : PROVIDED that all lands or real estate thus entered and taken possession of, and used by the said corporation, and which are not donations, *shall be purchased by the said corporation* of the owner or owners of the same, *at a price to be mutually agreed upon betwixt them ; and in case of a disagreement of the price,* it shall be the duty of the governor of the state, upon a notice to be given him by the said corporation, to *appoint three commissioners, &c., to determine the damages* which the owner or owners of the land or real estate so entered upon by the said corporation has or have sustained by the occupation of the same ; and *upon payment* of such damages," (with the costs of the appraisement, or upon depositing the amount of such damages in a bank in the city of Albany to the credit of such owner or owners, notice thereof being given,) " then the said corporation shall be deemed to be seized and possessed of the fee simple of all such land or real estate as shall have been appraised by the said commissioners ; and it shall be the duty of the said commissioners or a majority of them to deliver to the said corporation a written statement of the award or awards they shall make, with a description of the land or real estate appraised, to be recorded by the said corporation in the clerk's office of the county where the land or real estate may lie." The defendants pleaded *that they entered* the several closes, &c., *for the purpose of causing such examinations and surveys to be made* as might be necessary to determine the most advantageous route, &c., for the proper line, course, road and way whereon to construct their road or ways ; *and for the purpose of taking possession of and using* so much of the several closes, and of the earth and soil thereof, as might be indispensable for the construction and maintenance of their railroad and ways and the accommodations requisite and appertaining to them, and did then and there take possession of and use so much of the several closes, and of the earth and soil thereof, as was indispensable for the purposes aforesaid, as they lawfully might ; which are the said several trespasses, &c. To this plea the plaintiff interposed a *general demurrer,* and the defendants joined. The supreme court held the plea sufficient, and gave judgment thereon for the defendants. See opinion of supreme court, 14 *Wendell,* 54, &c. The plaintiff sued out a writ of error, and the cause was argued in this court by

*S. Stevens,* for the plaintiff in error.

*B. F. Butler,* (attorney-general of the United States,) for the defendants in error.

*Points insisted on by the plaintiff in error :*

I. The act incorporating the defendants is contrary to the provisions of the constitution of the United States and of the state of New York, and is therefore void. In support of this point were cited *Const. of U. S., art.* 1, § 10 ; *art.* 6, § 2 ; *Amendments to same, art.* 5 ; *Const. of N. Y., art.* 7, § 1, 7 ; and the cases referred to by complainant's counsel in *Beekman* v. *Saratoga and Schenectady Railroad Company,* 3 *Paige's R.,* 45.

II. The statute incorporating the defendants is in derogation of the common rights of other citizens, and is therefore to be construed strictly. The powers and privileges granted by such a statute cannot be extended beyond the express words of the act, or their clear import. (*Sprague* v. *Birdsall,* 2 *Cowen,* 420. *Coolidge* v. *Williams,* 4 *Mass. R.,* 145 ; *Sess. Laws of* 1826, *p.* 286.)

III. The proviso in the 7th section of the act incorporating the defendants is a condition precedent to the right of the defendants, to enter upon and take possession of the land of the citizen for the construction of the road. (*Sess. Laws,* 1826, *p.* 288, § 7.)

IV. To justify the defendants in entering upon and taking possession of the land of the plaintiff, their plea should show and aver specifically a compliance with the proviso of the 7th section of the act. (1 *Chitty's Pl., ed. of* 1833, *p.* 255, 6, 7.)

V. The plea demurred to does not aver or in any manner state or show, that

Bloodgood *v.* The Mohawk and Hudson Railroad Company,

the defendants have in any respect complied with the proviso of the 7th section of the act, and therefore forms no justification or defence to the trespasses complained of.

*Points insisted on by the defendants in error:*

. I. The plea is good. It shows that the defendants entered into and took possession of the plaintiff's closes under a valid law, and for the purposes and in the manner authorized thereby. (*Act of April* 17, 1826, *p.* 287, § 7. *Statutes and adjudged cases cited by supreme court in this case.*)

II. It is no objection to the plea, that it does not show that the premises in question have been purchased by agreement or appraisement, and paid for. 1. The law contemplates and authorizes an entry and possession for the purposes of survey and examination, and for the construction of the road *prior* to the attempt to agree, &c.; and from the necessity of the case, such prior entry is unavoidable. 2. The present action can only be sustained by showing that the defendants were [13] trespassers *ab initio*. If, by omitting to pay for the land, or by unreasonable . delay in the proceedings for that purpose, or by any other fact, they have made themselves such trespassers, the plaintiff should have replied the same. 3. As the record now stands, the defendants have fully justified the acts complained of.

After advisement, the following opinions were delivered:

*By the Chancellor.* The first and most important question in this case is, as to the constitutional power of the legislature to authorize the taking of private property for the use of a railroad, upon paying a just compensation to the owner for the property thus taken. In the case of *Beekman* v. *The Saratoga and Schenectady Railroad Company*, (3 *Paige's R.*, 45,) which came before me in another court, I decided that railroads for the conveyance of travellers, or the transportation of merchandise from one part of the State to another, were public improvements and for the public benefit, for the construction of which private property might be taken under the authority of the legislature, upon paying a just compensation therefor to the owners. That the *eminent domain*, or the right to resume the possession of private property for the public use, upon paying a just compensation therefor, remained in the government or the people in their sovereign capacity; and that such right of resumption might be exercised, not only for the public safety, but also where the interest or even the convenience of the State or of its inhabitants were concerned, as for the purpose of making turnpike and other roads, railways, canals, ferries, and bridges, for the accommodation of the public. That it belonged to the legislative power of the State to determine whether the benefit, which the public were to derive from such improvements, were of sufficient importance to justify the exercise of this right of *eminent domain*, in thus interfering with the private rights of individuals; and that the right itself might be exercised by the government through its immediate officers or agents, or indirectly [14] through the medium of corporate bodies or private individuals. The reasons upon which these conclusions were founded, are stated at length in the report of that case, and it is therefore unnecessary to repeat them here. In the subsequent case of *Varick* v. *Smith and the Attorney General*, (5 *Paige's R.*, 137,) I also arrived at the conclusion that this right of *eminent domain* did not authorize the government to take the property of one citizen for the mere purpose of transferring it to another, even for a full compensation, where the public was not interested in such transfer; and that such an arbitrary exercise of power would be an infringement of the spirit of the constitution, as not being within the powers delegated by the people to the legislature. To justify the exercise of the right there must be a necessity, or at least an evident utility on the part of the public. (*Ersk. Inst. B.* 2, *tit.* 1, § 2. *Per Lane, J.* 4, *Ohio R.* 286. *Per Green, J.* 3 *Yerg. R.*, 52.) Upon a further argument and examination of this subject, I have seen no reason to change the opinion I had expressed in the cases above referred to. On the contrary, since the decision in the case of *Beekman* v. *The Saratoga and Schenectady Railroad Company*, decisions have been made in the

11

Bloodgood v. The Mohawk and Hudson Railroad Company.

courts of some of our sister states, which have tended to confirm my views of this constitutional question. In the case of *Cotrill* v. *Myrick*, which came before the supreme court of *Maine*, in 1835, (3 *Fairf. R.*, 222,) it was claimed that the property, an alleged private right of fishery, which had been opened and improved for the benefit of the inhabitants farther up the stream, was not taken for public use, because the profits and emoluments of the improved fishery were granted to the inhabitants of two particular towns; but the court, in answer to this objection, said, "The public had an interest in the preservation and regulation of the fishery, and in the removal of obstructions by which it might be impaired or destroyed. This was best effected through the agency of persons appointed by the neighboring towns, and by quickening and rewarding their diligence by a grant of the profits. It is a course of proceeding adopted by the legislature in many other cases, the authority of which has not been questioned. If public purposes and uses were to be promoted, as they undoubtedly were in the case before us, it was no objection to the power of appropriation by the legislature that it contributed also to the emolument or advantage of individuals or corporations. Many cases of this character exist, in which the legislative power is well established." And the court refers to the case of the right granted by statute in that state and in *Massachusetts* to the owners of mills to raise a head of water necessary for their operation, although the lands of others are thereby injured and rendered unproductive; ample provision having been made by law for compensating the owners of such lands for the injuries which they may sustain. A similar decision upon this constitutional question was made by the supreme court of Alabama in 1835, in the case of *Dyer* v. *The Tuscaloosa Bridge Company*, 2 *Porter's R.*, 296, where a corporation was authorized by the legislature to take private property for the site of a bridge, and to make a passage to the same. A similar power has been exercised by the legislature of this state for the last fifty years, in relation to turnpike roads, toll bridges, &c., without question, and also by the legislature of nearly every state in the union. In the case of *Harding* v. *Goodlett*, (3 *Yerger's R.*, 41), to which this court were referred on the argument, which came before the supreme court of *Tennessee* in 1832, it was held that the law of that state authorizing the taking of the land of an individual for the erection of a grist-mill thereon, at which all the inhabitants of the neighborhood should be entitled to have their grinding done in turn and at fixed rates, was such a public use as to authorize the exercise of the right of *eminent domain*, although the whole property and profits of the mill were to belong to the individual proprietor thereof. It is true, in that case, each individual could not be permitted to go to the mill and grind his own grist, but still it was the public utility of having such a mill, where each individual had an equal right to be served, which authorized the taking of the private property for such a purpose, upon payment of a full compensation for the same. So in the case of a ferry or railroad, although each member of the community cannot cross the river in his own ferry-boat, or ride upon the railway in his own car, or travel thereon with his own locomotive engine, he has an unquestionable right to cross the ferry in the usual way, or to travel on the railway in the accustomed mode of travelling thereon, paying the ordinary toll or fare; and the proprietors of the ferry or the railway would be liable to an action for damages if they refused, without sufficient cause, to permit him to exercise this right. It might as well be objected that a canal, made by an incorporated company, was not a public improvement, because each individual could not navigate it with a canal boat, or travel thereon with a steam-engine; or that a turnpike road was of no public utility, because each citizen could not conveniently transport produce and passengers thereon with his wagon and horses. I have no doubt, therefore, of the constitutional power of the legislature to take private property for the purpose of making a railroad, or any other public improvement of the like nature, upon paying a just compensation for such property, whether such

Bloodgood *v.* The Mohawk and Hudson Railroad Company

public improvement is made by the agents of the state, or through the medium of a corporation or joint stock company.   But the exercise of the power to take private property, even for uses which are confessedly public, should not be resorted to in any case, unless the benefit which is to result to the public is of paramount importance in comparison with the individual loss or inconvenience, and an ample and certain provision should always be made for a full and adequate compensation to the individual whose property is thus taken ; and that legislator will best discharge his duty who exercises this power as seldom as possible, consistently with the real interests and general welfare of the state.

Another very important question which arises in this case is, whether the legislature in fact authorized the defendants to enter upon the private property of the plaintiff and to construct their railroad thereon before his damages were actually assessed and paid, or offered to be paid to him ; and if such is the construction of the law, whether such a power is authorized by the constitution. In the case of *Rogers* v. *Bradshaw,* (20 *Johns.* [17] *R.* 735,) this court decided that where private property was taken for public use, it was not necessary that the amount of the compensation should be actually ascertained and paid for before such property was appropriated to the public use; that it was sufficient if a certain and adequate remedy was provided by which the individual could obtain such compensation without any unreasonable delay.   This decision has been followed by the courts of several of our sister states.   To this extent the opinion of Chancellor Kent, in the case of *Rogers* v. *Bradshaw,* must be considered as the settled construction of the constitutional provision on this subject, at least in this state.   I cannot, however, agree with my learned predecessor, in his subsequent reasoning in that case, upon which he afterwards acted in the case of *Jerome* v. *Ross.* (7 *Johns. Ch. R.* 344,) that it is not necessary to the validity of a statute authorizing private property to be taken for the public use that a remedy for obtaining compensation by the owner should be provided.   On the contrary, I hold that before the legislature can authorize the agents of the state and others to enter upon and occupy, or destroy or materially injure the private property of an individual, except in cases of actual necessity which will not admit of any delay, an adequate and certain remedy must be provided whereby the owner of such property may compel the payment of his damages, or compensation ; and that he is not bound to trust to the justice of the government to make provision for such compensation by future legislation.   I do not mean to be understood that the legislature may not authorize a mere entry upon the land of another for the purpose of examination, or of making preliminary surveys, &c., which would otherwise be a technical trespass, but no real injury to the owner of the land, although no previous provision was made by law to compensate the individual for his property if it should afterwards be taken for the public use.   But it certainly was not the intention of the framers of the constitution to authorize the property of a citizen to be taken and actually appropriated to the use of the public, and thus to compel him to trust to the future justice of the legislature to provide him a compensation therefor.   The compensa- [18] tion must be either ascertained and paid to him before his property is thus appropriated, or an appropriate remedy must be provided and upon an adequate fund, whereby he may obtain such compensation through the medium of the courts of justice, if those whose duty it is to make such compensation refuse to do so.   In the ordinary case of lands taken for the making of public highways, or for the use of the state canal, such a remedy is provided ; and if the town, county, or state officers refuse to do their duty in ascertaining, raising, or paying such compensation in the mode prescribed by law, the owner of the property has a remedy by mandamus to compel them to perform their duty.   The public purse, or the property of the town or county upon which the assessment is to be made, may justly be considered an adequate fund.   He has no such remedy, however, against the legislature to compel the passage of the necessary laws to ascertain

Bloodgood *v.* The Mohawk and Hudson Railroad Company.

the amount of compensation he is to receive, or the fund out of which he is to be paid. In the case under consideration, if this company were authorized to take possession of the plaintiff's property and complete the construction of their road before his damages were assessed and paid, or offered to be paid to him, he might have been wholly without redress, as he has no power to compel the assessment of damages, and no adequate fund was provided for the payment of the damages when ascertained. The citizen whose property is thus taken from him without his consent, is not bound to trust to the solvency of an individual, or even of an incorporated company, for corporations as well as individuals are sometimes unable to pay all their just debts; especially those corporations which are authorized to incur heavy responsibilities in anticipation of the payment of their capital by the subscribers for the stock; and if the true construction of this charter was such as is contended for by the defendant's counsel, I should hold that the provision which authorized the appropriation of the plaintiff's property to the use of the corporation before the damages had been ascertained and paid, was unconstitutional and void.

[19]     I cannot, however, agree with the learned judge who delivered the opinion of the supreme court in this case, that such is the fair and legitimate construction and meaning of the defendant's charter. It is a primary rule in the construction of statutes in those countries where the limits of the legislative power are restricted by the provisions of a written constitution, to endeavor if possible to interpret the language of the legislature in such a manner as to make it consistent with the constitution or fundamental law. Applying that principle to the statute under consideration, and having ascertained that it would be inconsistent with the fundamental law of the state, to authorize the defendants to take possession of the lands of an individual without having made an adequate and certain provision for the recovery of the damages which he would necessarily sustain by such permanent occupation of his property for the purposes of the road, there appears to be no difficulty in giving such a construction to this statute as will be consistent with the constitution and also with the probable intention of the legislature. This may be done effectually by considering what is very inartificially appended as a proviso to the seventh section, as in the nature of a *condition precedent,* not only to the acquisition of the legal title to the land, but also to the right to enter and take the permanent possession of the land for the use of the corporation. Indeed, such appears to me to be the more reasonable and fair construction of this section, independent of any constitutional difficulty in the way of a different construction. For upon the supposition that no injustice was intended by the legislature, it can hardly be presumed they meant to authorize the company to enter upon the lands of individuals, pull down their buildings, &c., and then take their own time to get the damages appraised and to pay the same; leaving the individuals injured thereby to seek for some uncertain remedy by action, if the company neglected to get the damages assessed within a reasonable time.

The conclusion at which I have arrived, therefore, is, that the defendants' plea is imperfect, in not averring that the damages had been regularly assessed [20]     and paid before the defendants entered upon the plaintiff's land and appropriated it to the use of the road; and that if they in fact entered and commenced the construction of the road before the damages were actually assessed and paid, the plaintiff has a technical right to recover in this action for all damages which he really sustained by such unauthorized entry, although these requisites of the statute were afterwards complied with. In that case, the defence arising from the subsequent assessment and payment of the damages, can only be pleaded to that part of the declaration which charges a continuance of the trespass after the damages were assessed and paid as required by the statute.

For these reasons I think the demurrer is well taken, and that the judgment

14

Bloodgood v. The Mohawk and Hudson Railroad Company.

of the supreme court should be reversed; with liberty to the defendants to amend their plea upon the payment of costs in this court and of the demurrer in the supreme court.

By Senator EDWARDS. The important questions which appear to me to be presented in this case for examination, are, *first*, whether the act is constitutional under which the defendants attempt to justify? If not, no plea, however well pleaded, could justify the trespass. And *secondly*, if the act is constitutional, was the plea correctly pleaded?

The principal objection, in my opinion, urged against the constitutionality of the act is, that the property was taken for a use not authorized by the constitution. The constitution authorizes private property to be taken for public use, on allowing the owner a just compensation.

Let us inquire, then, whether the act incorporating this company authorized it to take the property of the plaintiff for public use. The use for which it was taken is declared in the act. The company were authorized by the act to take it for the purpose of constructing a single or double railroad or way, between the Mohawk and Hudson rivers, &c.; to transport, take and carry property and persons upon the same, by the power and force of steam, of animals, or of any mechanical or other power, or of any combination of them which the company might choose to employ. Does the fact that the power to construct the road is given to a *company* alter the [21] nature of the grant? Surely not. It is entirely immaterial who constructs the road, or who defrays the expense of the construction. The object for which it is constructed must determine the nature of the grant, whether for public or private use. What object had the legislature in view in authorizing this company to construct the road in question over the plaintiff's land? It was not the private emolument the company was to receive for the use of the road. For such a purpose the right would never have been conferred. The legislature, who are constituted the judges of the expediency of taking private property for public use, came to the conclusion that the public required the use of a railroad between the cities of Albany and Schenectady. It deemed it inexpedient to construct it at the public expense, and adopted the policy of having a company construct it at its own expense and risk, having the money expended refunded by way of tolls or fare from the individuals who should travel upon it; reserving the right, however, to take it as the property of the state within a certain period. Because the legislature permitted the company to remunerate itself for the expense of constructing the road, from those who should travel upon it, its private character is not established; it does not destroy the public nature of the road, or convert it from a public to a private use. If such would be the effect in relation to railroads, the receipt of tolls for the use of turnpike roads would also determine the question that they too were for private instead of public use. The public have an interest in the use of these roads; any individual has a right to be transported upon them, at all reasonable times, on paying the usual fare, as much as he has the right of using a turnpike or a ferry on paying the usual toll. In the case of *Beekman* v. *The Saratoga and Schenectady Railroad Company*, (3 *Paige's R.*, 75,) the chancellor says: "The privilege of making a road and taking tolls thereon, is a franchise, as much as the establishment of a ferry or a public wharf, and taking tolls for the use of the same. The public have an interest in the use of the road, and the owners may be prosecuted for the damages [22] sustained, if they should refuse to transport an individual or his property, without any reasonable excuse, on being paid the usual rate of fare." If it is a public franchise, and granted to the company for the purpose of providing a mode of public conveyance, the company in accepting it, engages on its part to use it in such manner as will accomplish the object for which the legislature designed it. While the company, therefore, holds the property of individuals which it is authorized by the act to hold and use, it cannot convert it from the

Bloodgood v. The Mohawk and Hudson Railroad Company.

original design of the legislature by refusing to transport passengers and their property; a departure from that design in the use, would work a forfeiture of their privileges; and the legislature, from the nature of the grant, would have a right to interfere even had no such power been reserved in the act of incorporation; but the power to alter, amend or modify, was reserved in express terms in the act. The legislature, therefore, has the control over it, and may direct the management and use of the road in such manner as will best subserve the public interest.

A difference in principle has often been attempted to be established between those acts of the legislature which authorize companies to take private property for the construction of railroads, and those which authorize it to be taken for the maintenance of ferries, the erection of bridges and the construction of turnpike roads; but from the best reflection I have been able to give the subject, I have been unable to discover any such difference in principle. In the use of railroads, the company furnish the cars and receive the fare for the transportation of passengers and their property; so in the use of ferries, the company furnishes the boat and receives the fare for the like services. The latter have been considered and treated as public franchises from the earliest grants; why, therefore, should not the former? I admit that in the use of bridges and turnpikes there is more latitude given to the individual who wishes to transport his person or his property, as to the mode and manner in which it shall be done, than there is in the use of railroads or ferries. In the use of the former, he accomplishes his object by the aid of his own vehicle, and takes his [23] own time to effect it; while in the latter, he and his property are to be transported in such vehicles as the companies provide. But the mode does not alter the nature of the object; either method is to effect the same purpose, to wit, the transportation of the person and his property. The difference in the mode of accomplishing the object arises from the nature and necessity of the case. In the one case, safety and expedition render it necessary that the company should furnish the vehicle; in the other, the traveller may secure both of these objects by furnishing his own. In the one case it is practicable, in the other it is not, consistently with the safety of the traveller. It is not only necessary that railroad companies should provide the cars, and ferry companies the boats, to secure to the traveller safety and expedition, but it is so also as a matter of economy. The privileges therefore allowed these companies, to provide the vehicles for the accommodation of travellers, is a public benefit, and this is an additional fact to show their design for public use, rather than evidence in favor of a contrary inference. I cannot, therefore, realize any material difference in principle in these two classes of acts of incorporation; and it has been repeatedly held that the acts authorizing private property to be taken for the use of ferries, bridges and turnpikes, are acts authorizing it to be taken for public use, although the individual companies to whom these privileges are granted receive the emoluments arising from the grants. In the case of *The Charles River Bridge Company* v. *The Warren Bridge Company*, (7 *Pick. R.*, 496), Putnam, J. says, that " Bridges and ferries are *publici juris;* a toll is granted for services rendered to the public;" and again he says, " The proprietors of a bridge or ferry are under great liabilities to the public, and compellable to permit the public to use them on paying toll." In the case of *The State* v. *The Town of Hampton*, (2 *N. Hamp. R.* 25), Woodbury, judge, says: " It has always been understood in this state, and all turnpike grants have been made on the hypothesis, that lands taken for turnpike roads are taken for public purposes." In the case of *Rogers & Magee* v. *Bradshaw*, (20 *Johns. R.* 742), Chancellor Kent, in delivering the opinion of the court, [24] remarks that " Turnpike roads are in point of fact the most public roads or highways that are known to exist, and in point of law they are made entirely for public use, and the community have a deep interest in their construction and preservation." If the acts authorizing companies to take private property for

Bloodgood v. The Mohawk and Hudson Railroad Company.

the maintenance of ferries, the erection of toll bridges, and the construction of turnpikes, are acts authorizing it to be taken for public purposes, as it appears to me they most clearly are; and if there is no material difference in principle between these acts and those incorporating railroad companies in this respect, reasoning from analogy, I feel myself constrained to come to the conclusion that the taking of private property for the construction of the railroad in question was the taking it for public purposes; and as the act made ample provision for the individual owners whose property was to be taken for this purpose, it appears to me it is strictly within the provisions of the constitution; and the only remaining question to be considered is, whether it was properly pleaded in justification of the trespass alleged?

Formerly, much diversity of opinion seems to have existed as to the true rule of pleading statutes with provisos and exceptions. In the case of *Cathcart* v. *Hurdy*, (2 *Maule & Sel.*, 540), Lord Ellenborough said, " The rule was inflexible; if there be a substantive proviso creating an exception, it was for the party who would bring himself within it to plead it." *Bacon*, however, declared the rule to be, that if there be in that clause of an act of parliament which is plead, any proviso or exception, this must be recited, although it should make against the party reciting it; for as the proviso or exception is parcel of the clause which is plead, if this should be omitted, it would amount to a misrecital of the clause (6 *Bac. Abr. stat. L.*, 395); but the rule which seems to have prevailed, and which has been adopted by our judicial tribunals, is the one, with a single exception, laid down by *Treby*, Ch. J., in the case of *Joes* v. *Axer*, (1 *Ld. Raym.* 120). He says, " Where an exception is incorporated in the body of a clause, he who pleads the clause ought also to plead the exception; but when there is a clause [25] for the benefit of the pleader, and afterwards follows a proviso which is against him, he shall plead the clause and leave it to his adversary to shew the proviso." In the case of *Teal* v. *Fonda*, (4 *Johns. R.*, 305) Mr. Justice *Van Ness* says the only error in this rule of Chief Justice Treby is, in restricting it to provisos contained in a subsequent section or statute which was not warranted by the cases; and in the case of *Hart* v. *Cleis*, (8 *Johns. R.*, 48), the court says, " If the exception or proviso forms no part of the plaintiff's title or right of action, but merely a matter of excuse for the defendant, it need not be plead, but left to the opposite party. I think, therefore, we may fairly infer from the authorities, that it is immaterial whether the proviso or exception is in the same clause or a subsequent one: if the proviso or exception is necessary to give the party pleading the clause the right he claims under it, he must plead it. If, on the other hand, the proviso or exception forms no part of such right, but merely a matter of excuse for the opposite party, he need not plead it, but may leave it to the party who is to avail himself of the benefit of it.

The defendants in this plea set out substantially the part of the clause authorizing them to enter and take the plaintiff's property for the construction of their road, without setting out the proviso; and in order to determine whether it was necessary for them to set out the proviso, it becomes necessary to consider its nature and character. The proviso prescribes the condition on which the property of individuals is to be taken from them and converted to public use. It is a condition required by the constitution, and without which the property cannot be taken for the purposes contemplated by the act; it therefore constitutes an essential part of the clause to show the very existence of the right the parties claim under it. The plea treats the act in the same manner it would, had it not contained the proviso. Suppose the act had been passed, authorizing the company to enter upon and take possession of and use all such lands and real estate as might be indispensable for the construction and maintenance of their road, without requiring the company to pay a compensation to the individuals whose property should be taken, could the company justify the taking of the pro- [26] perty under it? Would not such an act be in direct violation of the constitu-

tion, and absolutely void? It appears to me it would, beyond all doubt, and that such an act, however well pleaded, could form no justification for the trespass alleged. But it was said by the defendants' counsel that this proviso formed a *condition subsequent*, and therefore it was unnecessary for the defendants to plead it, to justify their entering and taking the plaintiff's property for the construction of their road; and the supreme court seem to have entertained the same views with respect to the construction of this statute, for they say, " the purchase of the land on the payment of the appraised damages is a *condition precedent* to the vesting of the *fee simple* of the land required for the road in the corporation, but not to their *right to enter upon* and *take possession of* and *use* it for the construction of their road." If the payment of damages was only a condition precedent to vesting the *fie* of the land, and not to taking possession and using the land for the construction of the road, then it is obvious the proviso does not require the defendants to pay damages for the use of the land for the construction of the road or for its continuance: for if the payment of damages is a condition precedent only to the vesting of the fee, and not to the construction and continuance of the road, the company may never desire the fee; it is wholly unnecessary for the purpose of their road; all they require is the use of the land during the time of their grant; and the individual who has lost the use of his property during that period, and if it consist in buildings which have been destroyed, has lost it forever, is without the means of redress, because the company do not desire to become seized in fee of the land they occupy. If such be the true construction of the act, or if the act does not require the company, on taking possession of the land and constructing the road, (I will not say in making the necessary surveys to determine the route,) but on converting it from a private to a public use, then am I prepared to say that in my judgment it is in violation of the constitution and void, and of course could form no justification for the trespass alleged. The constitution declares that private property shall not be taken for public use without a just compensation. When is the compensation to be made? Clearly on the taking of the property; for it declares it shall not be taken without a just compensation. It is to be simultaneous with the act of taking the property, that is, depriving the owner of the use and benefit of it, and appropriating it to public use. This appears to me to be the fair and rational construction of this clause of the constitution; the framers of it could not have designed that the private property of individuals, which, in some instances might constitute their whole means of subsistence, should be taken upon credit. Adopt the contrary construction, and it enables the company who may be authorized to take the property, to deprive the individual in some instances of his whole estate, for a time at least; and if the company finally prove insolvent, a total loss would ensue. Could the framers of the constitution ever have intended to arrest from individuals, by the strong arm of government, their property, and compel them to rely upon the precarious and uncertain responsibility of railroad companies? I cannot for a moment believe it. The power of taking private property for public purposes is at best an arbitrary power, and justified only by the law of necessity, and therefore should never be exercised without rendering promptly a just equivalent to the individual sufferer.

I am aware that under the statutes authorizing the construction of canals, the commissioners are authorized to take private property; and that the damages are *afterwards* to be appraised and paid for by the state; and that the right of the commissioners to enter upon and take the property of individuals before the state compensates the owner, has been sanctioned by the judicial decisions of this state. (See *Rogers & Magee v. Bradshaw,* 20 *Johns. R.* 744; *Jerome v. Ross,* 7 *Johns. Ch. R.* 343; *Wheelock v. Pratt,* 4 *Wendell,* 650.) And although I am decidedly of the opinion that the construction given to the constitution under these decisions, is a forced construction, and one which was pressed upon the court, from the extreme necessity of the case, I do not feel disposed to controvert them, nor is

Bloodgood v. The Mohawk and Hudson Railroad Company.

it necessary to do so, for the purpose of coming to the conclusion I have arrived at, in the case under review. The strong reason why a strict and rigid compliance with the terms of the constitution has not been required, where private property has been taken for the construction of canals, is, from the undoubted responsibility of the state to compensate the owner. When legal provisions have been made for payment by the state, it has been deemed ready pay or an equivalent. But this reason cannot exist in its full force when applied to incorporated companies. They are often irresponsible, and no such general rule can be established as applicable to them, without greatly hazarding the property of the individual. I am decidedly of the opinion, therefore, that no such construction can with propriety be given to the constitution, when applied to them; and if the act admits of such a construction, and such only, then is it unconstitutional and void, and could furnish no protection to the defendants, even had they set out the proviso, unless they had averred that they had satisfied the damages, or that they were ready and willing to make satisfaction. But I have before come to the conclusion that this act is constitutional, and I do not, therefore, give it the construction which it received from the supreme court. I cannot believe it was the intention of the legislature that the defendants should be permitted to take possession and use the land of individuals for the construction and maintenance of the road, and afterwards pay the damages only as a condition of becoming seized and vested of the fee. They intended that the individual whose property was taken should be paid his damages; and although the fee was to vest on the payment of the damages, yet it was not for the fee the damages were to be paid, but for the occupancy, for the purpose of building and maintaining the road during the period of the grant. Not that this occupancy was to precede the assessment, but the commissioners are to anticipate what the damages would be for the occupancy of these lands for the use and maintenance of the road during that period. If, however, occupancy should precede assessment, it does not follow that it should be such an occupancy as would be necessary [29] to construct the road; a mere location of the track, without breaking the ground, would be an occupancy.

From the view, therefore, I have taken of this case, I feel myself bound to come to the conclusion that the proviso in the clause granting the right of entry was an inseparable part of it, and essential to its very existence; that without it the act would be imperfect, and form no ground on which the defendants could justify; and that in order to justify, they were bound to set out the proviso as well as the enacting clause which preceded it; and not having done so, their plea is insufficient, and the demurrer is well taken. I am, therefore, for reversing the judgment of the supreme court, with leave to the defendants to amend their plea on payment of costs.

*By Senator* MAISON. The question presented in this case is, whether the defendants have shown enough in their plea to justify themselves in taking possession of, and using the plaintiff's property, in the manner they in their plea have admitted; and this involves the consideration, whether the act of the legislature of this state, as far as set forth in the plea, is or can be deemed a constitutional law; for if it be unconstitutional, then clearly the defendants must fail in the justification which they have set forth in their plea, and the demurrant must prevail.

Our States and union are governed by written constitutions, the provisions of which are framed with the most studied caution, and designed to relieve the people from an uncontrollable despotic power, under which they had lived, and to interpose barriers to the exercise of that power, to the preservation of their lives, liberty and property, which they saw and knew were so eminently endangered while subjected to the caprice of a parliament, whose political power was omnipotent, unregulated, and uncontrolled by any written constitution. We read from *Blackstone's Commentaries, 1st vol.,* 160 that " the power and jurisdiction of par-

liament [says Sir Edward Coke] is so transcendent and absolute, that it cannot be confined, either for causes or persons, within any bounds ; and of this high court he adds, it may be truly said, ' *si antiquitatem spectes, est vetustissima ; si dignitatem, est honoratissima ; si jurisdictionem, est capacissima.*' It hath sovereign and uncontrollable authority in the making, confirming, enlarging, restraining, abrogating, repealing, reviving and expounding of laws, concerning matters of all possible denominations, ecclesiastical or temporal, civil, military, maritime or criminal : this being the place where that absolute, despotic power, which must in all governments reside somewhere, is entrusted by the constitution of these kingdoms. All mischiefs and grievances, operations and remedies, that transcend the ordinary course of the laws, are within the reach of this extraordinary tribunal. It can regulate or new model the succession to the crown, as was done in the reigns of Henry VIII and William III. It can alter and establish the religion of the land, as was done in a variety of instances in the reigns of King Henry VIII. and his three children. It can change and create afresh even the constitution of the kingdom and of parliaments themselves ; as was done by the act of union and the several statutes for triennial and septennial elections. It can, in short, do every thing that is not naturally impossible ; and therefore, some have not scrupled to call its power, by a figure rather too bold, the omnipotence of parliament. True it is, that what the parliament doth, no authority upon earth can undo." Under our state and federal institutions, the powers of the general and state governments are clearly defined and well understood. The government of the United States is a government of delegated power, and it can exercise none other than that which is clearly and distinctly given ; to it the people have literally said, " thus far shalt thou go, and no farther." To guard against the right of assuming or exercising, by inference, any powers besides those delegated, provision was made in the 10th article, in amendment of that constitution, that " the powers not delegated to the United States, by the constitution, nor prohibited by it to the states, are reserved to the states respectively or to the people ;" and delegated powers are so far restricted in their exercise, that " no person shall be deprived of life, liberty or property, without due process of law, nor shall private property be taken for public use without just compensation." The constitution of this state is not a constitution delegating power, but a constitution regulating and restraining power. The legislature of our state, composed of the representatives of the sovereign power, have the right to exercise sovereign power ; and it is the same in degree as the English parliament, except so far as it is restrained by the constitution itself, and the constitution of the United States. In our constitution is introduced the same restraint upon the exercise of absolute power, to wit, " no person shall be deprived of life, liberty or property, without due process of law ; nor shall private property be taken for public use without just compensation." Without these restraints upon legislative power, private property, without compensation could be taken for the public use, as in England and in South Carolina, where no such restraints exist. ( *The Governor, &c., of the Cast Plate Manufacturing Company* v. *Meredith*, 4 *T. R.* 794. *Starke* v. *McGowan*, 1 *Nott & McCord's S. C. R.* 387.) And it is with great regret I notice this case in South Carolina, as existing in a free republican country, where the enjoyment of private property should always be held sacred and inviolable, except in urgent pressing necessity, in regard to public health, public defence, or public uses. Even in England, where no restraints exist, to their honor be it spoken, and in high commendation of their regard for private right, they have not outraged public justice, by taking from the citizen his property for public use without compensation. If any case could there have occurred, which would have justified the exercise of such despotic power, the public sense would not have been offended had the government exercised it towards the proprietors of the Isle of Man. " The distinct jurisdiction of this little subordinate royalty,"

says *Blackstone*, (1 *Comm.* 106,) being found inconvenient for the purposes of public justice and for the revenue, (it affording a commodious asylum for debtors outlaws and smugglers,) authority was given to the treasury, by statute 12 Geo. I. ch. 28, to purchase the interest of the then proprietors, for the use of the crown; which purchase was at length completed in the year 1765, and confirmed by [32] statutes 5 Geo. III. ch. 26 and 39, whereby the whole island and all its dependencies, so granted as aforesaid, (except the landed property of the *Atholl* family, their manorial rights and emoluments, and the patronage of the bishoprick and other ecclesiastical benefices,) are unalienably vested in the crown, and subjected to the regulations of the British excise and customs."

Fortunately, in the case under consideration, the legislature of this state are not obnoxious to the imputation of usurping despotic power in violation of the constitution, by the grant which they have made to the defendants in error, authorizing the construction of their railroad, to take private property for public use without rendering compensation, as the plea which they have interposed to the plaintiff's declaration would seem to indicate. That plea insists that the defendants stand justified of the trespass, because the legislature of this state has given them a right to enter upon, take possession of, and use the plaintiff's land for the purposes of their road, without alleging in that plea, as they should have done, that they had made to the plaintiff in error a compensation for the land thus used. I have, therefore, no hesitation in declaring, that any statute to the extent only as set forth in this plea, would be unconstitutional and void, and would consequently afford no justification for the trespasses charged. In coming to this conclusion, I have anticipated the decision of another question raised in this case, to wit, whether it was incumbent on the defendants to set forth in their plea, that they had made to the plaintiff compensation for his lands, or whether this was matter for the plaintiff to reply. On this branch of the case we have heard much of exceptions and provisos in statutes, and what their legal effects are when found in the enacting clause, and when in a subsequent clause. It is unnecessary to pass in review the great number and variety of cases, which have been cited to us on this point, as they are all resolvable into a very plain and simple proposition, and that is, that a party in pleading must make out his case, clearly and distinctly; showing a state of facts which, if true, would entitle him to judgment. Testing this plea by this rule, it is evident that the plea is [33] defective, in that it reposes upon a void and unconstitutional law, (I mean if the law be only to the extent as set forth in the plea, and only so far can we regard it in this case,) for a justification, which is no justification, and upon which no judgment could be rendered for the defendants. The fact of having made compensation for the land taken, is indispensable to a perfect justification; it is a fact intimately connected with the defendants' case, and indeed the vitally important fact to be alleged, without which the plea cannot be sustained, unless we can sanction the constitutionality of a law authorizing the taking of private property for public use without compensation. The act incorporating the defendants is declared, in the 20th section, to be a public act, and although the courts will, *ex officio*, take notice of a public act, without its being stated in the pleadings, yet it is incumbent on the party to state all the facts necessary to bring his case within the protection afforded by the statute. (*See Bennet* v. *Hurd*, 3 *Johns. R.*, 438 ; *Teal* v. *Fonda*, 4 *id.* 306 ; *Hart* v. *Clies*, 8 *id.* 43.) The fact of compensation having been made, is a link in the chain of a perfect defence, and as we cannot presume that payment has been made, it is necessary for the party in his pleading to allege it. The plaintiff cannot be called upon to reply to the defendants' plea, unless that plea make out a perfect defence. Can it with any reason be pretended, that the plaintiff should be held to reply that the defendants had not made him compensation for the lands taken? This would cast upon the plaintiff the burden of proving a negative. How could he prove that the defendants had never paid him? and yet how perfectly within the power

Bloodgood *v*. The Mohawk and Hudson Railroad Company

of the defendants to prove payment, if payment had actually been made. It is only necessary to state the proposition, that its palpable absurdity may be seen.

I have thus far remarked upon the plea without any particular reference to the provisions of the act under which the defendants seek to justify. Let us examine that act, with a view of ascertaining the correctness of the con- [34] clusions to which I have arrived. We are not to presume that the legislature intended to deprive the plaintiff of his lands without compensation; and we are bound to give such construction to this section as will carry out the intention of the legislature, without infringing upon or violating the provisions of the constitution. Their enactments are to be intended to be made in subordination to, and not in violation of that instrument. What, then, did the legislature understand, and what do we understand by the expression "nor shall private property *be taken* for public use," and what did they, and should we understand by the expression "*without just compensation.*" The entering upon land and making the necessary surveys and examinations thereof, for the purpose of determining the most advantageous route, place or places, for the proper line, course, road and way, whereon to construct the single or double railroad or ways, is not, in ordinary acceptation or legal contemplation, the *taking of land,* there is no exercise of conclusive control or authority over the soil. A mere passing over for the purpose of examining and surveying the most feasible route for the road, and of the lands necessary to be taken, on which to construct the road, cannot be said to be taking the land thus examined and surveyed. But when the examinations and surveys are completed, and the defendants in pursuance thereof have selected the lands intended for the objects of the incorporation; when they enter upon the possession of and use the lands thus selected in the construction of their road, regardless and in defiance of the rights and possession of the owner of the fee, then may it be said in common parlance and in legal sense, that the defendants *have taken* the plaintiff's land; they are using it as their own, in exclusion of the plaintiff's right to use it. Although the legal fee may not be in them, yet are they exercising all the attributes of absolute ownership; they tear down houses and out-houses; they cut up gardens, meadows, fields and farms; they reduce hills and fill up valleys; they tear down fences, cut up and use the soil, as best answers their purposes, and do every act in relation thereto, which the absolute owner of the fee can do. If this is not taking land, I know not what act shall be deemed evidence of taking. Can land be thus [35] taken and used, and cut up, and disfigured, and occupied, without making compensation to the owner? The defendant's plea in this case insists that it can, and we are called upon solemnly to determine that such pretensions are well founded and according to constitutional law. It is pretended that the *taking of land,* means the taking the fee of the land, that no citizen shall be deprived of the fee of his land without just compensation? Is it, then, to be understood that the legislature can do any thing and every thing with the property of the citizen; and authorize its use and occupancy for all time to come, and that too, under constitutional sanction, so long as they do not interfere with the fee? Such a position would shock the common sense of the community—outrage public justice, and desecrate, upon the altar of unrestrained omnipotent legislation, which is despotism, the life-blood and spirit of the constitution. But private property shall not be taken without *just compensation.* There can be no diversity of opinion as to the meaning of the words *just compensation.* It is a fair equivalent in money, a *quid pro quo;* it is a recompense in value for the property taken. *When* the compensation is to be made, may perhaps be a matter of doubt; whether before the property is taken or used, or afterwards. It must either be paid before the property is taken, or within a reasonable time thereafter; and the making of this compensation must be as absolutely certain, as that the property is taken; it must not be dependent on any hazard, casualty or contingency

Bloodgood v. The Mohawk and Hudson Railroad Company.

whatever. This I understand to be the spirit of our legislation hitherto, on sub-jects of this character.

The 16th section of the act to regulate highways, (2 R. L. 217,) authorizes the laying out of roads, through improved and cultivated lands, and declares that the owner or owners thereof shall be paid such damages as he or they may sus-tain by reason thereof. The section then prescribes the manner in which such damages shall be ascertained; and declares that the whole of said damages, to-gether with the charges of the commissioners, justices and freeholders, and sum-moning the jury, shall be presented to the board of supervisors of the county, who shall cause the same to be raised, levied and collected in the [36] town in which the lands lie, in the same manner as the other town charges are by law directed to be raised, levied and collected, and order the same to be paid to the commissioners of the town, who shall pay the owner the sum assessed to him, and appropriate the residue to satisfy the costs. Here, the faith and sol-vency of the town are pledged to the owner, that he shall certainly be paid for his property taken for the road. In such case the property is allowed to be taken and used before payment, and for the reason that the payment will cer-tainly be made without hazard or doubt. (Cadwalladers' heirs v. McIlvoy, 1 A. K. Marsh. R. 84. Jackson v. Winns' heirs, 4 Litt. R. 323.)

So the act in relation to the opening and laying out streets in the city of New York, (2 R. L. 409, § 178,) provides that when any lands, &c., shall be re-quired for the purpose of opening any public square, place, street, or avenue, &c., or for the purpose of laying out and forming or extending, enlarging, straightening, altering or otherwise improving any street, or public place, so to be laid out, &c., the same may be taken, and compensation and recompense made to the parties, &c., and the mayor, aldermen and commonalty of the city may make application to the supreme court for the appointment of commissioners, who are to assess the damages to the owners whose lands are taken, &c., in the manner prescribed by the act, and to make report thereof to the supreme court, &c.; upon the final confirmation of the report, the corporation are de-clared seized in fee of the lands, &c., thus required for the public use, and may immediately take possession thereof, &c. In this act, also, provision for certain payment, without hazard, is made; the 183 section, page 418, declares that the damages assessed, &c., shall, within four months after the confirmation of the re-port, be paid by the mayor, aldermen and commonalty; and the damages are to be raised by tax, upon those of the citizens who ought to pay the same. The faith and solvency of the city are here pledged for payment. To the same pur-port is the "act for opening and improving the great roads within this state," (3 Greenleaf's ed. of the Laws, 284,) which provides for the assess- [37] ment of damages, and directs payment out of the proceeds of three suc-cessive lotteries by that act authorized.

The 3d section of the Canal Act (Sess. L. of 1817, ch. 262), declares it shall be lawful for the canal commissioners to enter upon, take possession of, and use all and singular, any lands, &c., for the promotion of the improvements intended by that act. The section then prescribes the mode in which the damages are to be assessed, and declares "the canal commissioners shall pay the damages so to be assessed and appraised, and the fee simple of the premises so appropriated shall be vested in the people of this state." The act does not provide any funds for the payment of the damages thus assessed; and although the faith of the state is impliedly pledged for the payment of these damages, yet was their pay-ment dependent upon the contingency of the legislature being willing to make provision for their payment. With all due respect for the decision of the court in the case of Rogers v. Bradshaw, (20 Johns. R., 735), and while I am not dis-posed to arraign or question the high honor and integrity of the people's repre-sentatives, I cannot subscribe to the constitutionality of the law depriving the citizen of his property, without providing an absolute, certain mean for making

23

Bloodgood v. The Mohawk and Hudson Railroad Company

to him ample remuneration ; nor could I consent to surrender or compromise my judgment upon the faith I might have in the liberality, magnanimity or justice of the legislature, that they would make provision for a just compensation, or payment for the property taken. Neither can I subscribe to the doctrine of the case of *Jerome* v. *Ross* (7 *Johns. Ch. R.*, 344), which arose under the same canal act, in which Chancellor Kent says : "If the act we are examining has omitted to make any provision for the assessment and payment of damages, for such temporary use, (the use of a rocky hill in getting stone for a dam) it may have escaped the attention of the legislature, or the case may have been deemed at the time immaterial and unimportant. The omission, however, if it be one, does not prevent the right of the commissioners to enter and use the land ; nor pre[38]   vent the just claim of the owner upon the commissioners or the legislature for his reasonable compensation. The commissioners are not trespassers, when the act authorizes them to enter before the damages are paid for. This was so understood and declared in *Rogers* v. *Bradshaw*. The claim for compensation arises after the use has been had, and the damages cannot well be assessed before they have arisen." I would have been better satisfied with that decision if the power of the court had been exerted in restraining the canal commissioners from interfering with the private rights of the citizen, until adequate provision for certain satisfaction had been made, as the chancellor directed in the case of *Gardner* v. *The Village of Newburgh*, hereafter to be mentioned, and as has been the course of the court in analogous cases. (*Shand* v. *Henderson*, 2 *Dows' Parl. R.*, 521 ; *Agar* v. *The Regent's Canal Company*, *Cooper's Eq. R.*, 77 ; *Belknap* v. *Belknap*, 2 *Johns. Ch. R.*, 463). The case of *Wheelock* v. *Pratt*, (4 *Wendell*, 648), rests for its decision on the cases of *Rogers* v. *Bradshaw*, and *Jerome* v. *Ross*. At page 650, the late chief justice says : "Any law which should authorize private property to be taken for public use, and should at the same time direct that *no compensation* should be allowed for it, would be unconstitutional ; but according to the preceding cases, a law which authorizes such appropriations, and *merely omits* to provide the mode of making such compensation, is not unconstitutional." It never could have been the intention of the constitution to authorize the legislature to take from a citizen his property and leave him to trust for compensation, at the end of a law suit against the canal commissioners, or to lobby the legislature, appealing to their magnanimity, justice or mercy, to provide him a compensation for his property taken for public use. The language of the constitution is explicit and unambiguous. "Private property *shall not be taken* for public use without just compensation." But according to some of the above decisions, private property may be taken for public use without even any provision being made by law for compensation. Compensation, according to my understanding, is to be made before the property be taken ; or, indulging in great liberality of construction, the property [39]   may be taken, on there being an ample and absolute provision made for positive, certain payment, in a reasonable time, without subjecting the citizen to hazard, contingency, litigation, or imploration.

The act relative to turnpike companies, 1 *R. L.*, 231, has been cited to us as more clearly indicative of the sense of the legislature, as to the extent of their constitutional power, in the particulars under consideration. The third section of that act authorizes the commissioners appointed by the governor to lay out the road directed by the act of incorporation, and directs the commissioners to file an accurate map of the survey of the same ; and in case of disagreement between the company and the owner of the land as to the value thereof necessary for the use of the company, and the damages (if any) to be done to said land, the damages are to be assessed in the manner prescribed by the act, "which each or any of the owner or owners of any parcel of land *used*, and to be used for such road, have sustained or will sustain ; *and the company, upon paying* said owner or owners their damages, may have and hold to them and their successors and

Bloodgood *v.* The Mohawk and Hudson Railroad Company.

assigns forever, the lands and tenements, &c., *provided* that nothing in this act contained shall be construed to authorize the said president and directors to *enter upon* such land for the purpose of making such road until they have paid such damages," &c. It was in the spirit of this law and of the constitution that Chancellor Kent, in the case of *Gardner* v. *The Village of Newburgh*, (2 *Johns. Ch. R.*, 166, remarked : " To render the exercise of the power valid, [the power of the legislature to take private property for necessary or useful public purposes.] a fair compensation must in all cases be previously made to the individuals affected, under some equitable assessment to be provided by law. This is a necessary qualification accompanying the exercise of legislative power in taking private property for public uses. The limitation is admitted by the soundest authorities, and is adopted by all temperate and civilized governments from a deep and universal sense of justice." See also *The People* v. *Platt*, (17 *Johns. R.*, 215.) In this case, the chancellor with great propriety, exercised his judicial power in defence of private rights against legislative encroach-  [40] ment, by ordering an injunction to issue, prohibiting the trustees of Newburgh from diverting a stream of water of the plaintiff, to the supplying the village with pure and wholesome water, until some provision was made for affording compensation to the plaintiff; no provision having been made by the statute to remunerate those through whose land the water issuing from the spring had been accustomed to flow.

We are now prepared to look into the law incorporating this railroad company, with a view of ascertaining whether its provisions are in accordance with the constitution, or its spirit; whether it directs payment to the plaintiff, or whether provision is made that he shall most certainly be paid for the land taken by the defendants for their road. If no provision be made for an absolute and certain payment at a future day, then we are bound so to construe the law as to make it conform with the provisions of the constitution. The act provides that the corporation shall pay the owner or owners for the land taken. When is this payment to be made ? There is no precise specified time of payment particularly designated in the act, nor is there any safe and unquestioned fund provided for payment, nor any security provided therefor, except the solvency of the corporation. It cannot be admitted that the legislature intended to deprive the plaintiff of his property, compelling him to rely on the solvency of this company for compensation. There is no certainty of payment in this ; for *non constat* but that the company may be utterly insolvent before they shall have completed their enterprise. I have no doubt of the perfect solvency of this corporation, and their unquestioned ability to make their compensation, either before they commenced or after they had completed their road ; but we are looking for a principle which shall be of general application, irrespective of the solvency of any particular corporation—a principle which shall shield and protect the citizen from all hazard of loss, securing to him absolute certainty of compensation for his property taken for public use. To render the law constitutional, then, we must intend that the legislature, in the provisions they have made, have declared that compensation shall be made *before* the property can be taken. This is no forced construction of the act. [41] In the construction of statutes made in favor of corporations or particular persons, and in derogation of common right, which are statutes not deserving of much favor, we are not only not to extend them beyond their express words and their clear import, (*Sprague* v. *Birdsall*, 2 *Cowen's R.*, 420,) but are to confine them within the bounds and limits prescribed by the constitution ; they are to be construed in favor of the legal owner, and in the preservation of his constitutiona. rights. The act declares that the corporation may enter upon, and take possession of, and use all such lands and real estate, &c., provided that all lands or real estate thus entered and taken possession of and used by the corporation, shall be purchased by the said corporation of the owner or owners of the same, at a price

Bloodgood *v.* The Mohawk and Hudson Railroad Company.

to be mutually agreed upon betwixt them. It is conceded that if the proviso had read, that all lands or real estate thus entered upon and taken possession of, and *to be* used by the said corporation, shall be purchased, &c., that there could have been no doubt that payment must precede the use. As, however, no certain payment at a future day is provided, we must construe this law, in order to sustain its constitutionality, so as to read as suggested. The payment must precede the use. It is true, as suggested by the learned judge who delivered the opinion in the case in the court below, that "an examination of the soil by ploughing or digging might be indispensable, in order to determine the practicability of a particular location, or the expediency of adopting one route in preference to another. The quantity of land necessary for the construction of the road, and the damages sustained by the owner in consequence of the taking or occupation thereof by the company, would scarcely, in any instance, be accurately determined until the road was completed, or considerably advanced in its construction." These are inconveniences easily to be foreseen in this case, as well as in all others where an attempt is made to violate the sanctity of private right; but they are not to be taken into the account, nor to be urged in favor of those who, under color of law, [42] are seeking to wrest from the citizen his private property. Inconvenience and necessity, the standing arguments in justification of usurpation, are not here to be urged in excuse for frittering away or overriding the plain and palpable intent of the constitution. The rights of the citizen, at the hazard of all inconvenience and necessity, are to be scrupulously guarded and protected. The inconvenience suggested is in the power of the citizen to obviate; which he may or may not do, at his pleasure. If he is willing to assume upon himself the risk of receiving compensation for his land from the company, where no other certain means of payment is provided for him, he has the undoubted right to permit his land to be taken and used before payment; this is a matter of arrangement between him and the company, with which neither the government nor individuals have any right to interfere. But the learned judge says: "The proviso relates merely to the final and absolute vesting in the corporation of the fee simple of the land thus taken possession of; the land must be purchased, or appraised and paid for, before the *title* can vest in the corporation." This is certainly true; but the final and absolute vesting in the corporation of the fee, is imposed as a condition to the use of the land. The land is to be taken, provided the corporation purchase it of the owner; the fee in such case will be vested in the corporation by the conveyance; if they cannot agree as to the price, then the damages are to be assessed in the manner pointed out by the act, and upon the corporation depositing in any bank in the city of Albany, the amount of such damages to the credit of the owner, then the act transfers the fee to the corporation; in either event, the fee must pass before the corporation have any right to use and occupy the land. Any use or occupancy of the land without the consent of the owner, beyond examination and survey, before payment made in one or other of the modes prescribed by the act, is a trespass. (*Hughes* v. *Trustees of Morden College,* 1 *Vesey,* 188; *Shand* v. *Henderson,* 2 *Dows' Parl. R.,* 521, 523; *Belknap* v. *Belknap,* 2 *Johns. Ch. R.,* 473.) The making or adequately providing compensation is a condition precedent; it must be fully and literally per-[43] formed before the citizen can be deprived of the use, occupancy or fee of his land. Let us for a moment see the effect of a contrary rule. If the corporation are justifiable in occupying and using the plaintiff's land without paying for it, and are not liable in trespass for such occupancy and use, why should the company want the fee? All the company want is the undisturbed use of the land; to them it is totally unimportant in whom the fee is vested. They want not the fee, but the use; and if they can enjoy the use without making any compensation for such use, the purchase of the fee by them would be an idle, nonsensical waste of their money. Though corporations have no consciences, nor souls to commiserate the condition of others; though they are not

Bloodgood v. The Mohawk and Hudson Railroad Company.

far-famed for a ready willingness to dispense justice to those who may have claims upon their coffers, yet they are proverbial for their keenness and sagacity in amassing wealth, and not too unfrequently at the expense of others. Who can imagine that a railroad corporation will pay for the fee of the land over which their road is laid, if they can have the undisturbed use of it for nothing? And what interest can they have in making an advance to have the amount of damages assessed, if they can fully enjoy the use and occupancy of the land without it; for it will be remembered that by the act, in case of a disagreement as to price, it is made the duty of the governor, upon a notice to be given to him *by the said corporation*, to appoint three commissioners, &c., to determine the damages. The owner of the land has nothing to do with it. He is not authorized by the act to take any measures to compel an assessment to be made; he must wait patiently the good will and pleasure of the corporation. I will here make the passing remark, that this provision of the statute authorizing the appointment of these commissioners, upon the application of the company only, is clearly indicative of the sense and determination of the legislature that compensation must be made before the property can be taken or used. It is only in this view of the statute that the company could have any interest to make such application; an interest which the legislature intended to create for the protection of private right, and to compel a rigid compliance with the pro-  [44] visions of the constitution.

But it is said that the corporation will be compelled by due course of law to make remuneration, or in the language of the learned judge below, "That the plaintiff would have an ample remedy in such a case in *some form of action*, there can be no question." What form of action? I know of no action so simple and so well adapted to the attainment of full and equal justice as an action of trespass, particularly when trespass has been in point of fact committed, unjustified by any constitutional law, as that law would be, as set forth in the defendant's plea as a justification. It is further contended that the ascertainment of damages, and the payment thereof, are conditions subsequent. Subsequent to what? to the vesting of the fee? The fee is vested simultaneously with the payment of the damages, and not before. Subsequent to the use and occupation of the land? Then may the owner be prohibited from asking indemnification until the corporation shall have ended by its own limitation. Subsequent to the completion of the road? where is the law declaratory of this, and where the tribunal or authority to determine when the road shall be deemed to be completed? But the road may never be completed? the corporators may abandon their enterprise in despair, from a conviction that it is absolutely profitless not only, but that if persevered in, would involve every one concerned in insolvency and ruin. Must, then, the owner's compensation for his land depend upon the contingency of the enterprise being a profitable or successful one? Who can subscribe to a proposition so monstrous and absurd? If there be any one act, thing or event which can be named, subsequent to which the owner is to be paid for his land, what is the consequence of non-payment? A forfeiture, it is answered. A forfeiture of what? not of the fee, for that does not vest till payment, but of the right to use and occupy the plaintiff's land for a railroad; a right which never existed; and never can exist but upon a just compensation made. But admit the right to exist, and that it be forfeited for non-payment of the damages, is this forfeiture compensation? Is this payment to the owner for the loss of his buildings, the disfiguration  [45] and mutilation of his property, his deprivation of the use of it, and the expense of replacing his buildings and fences, and restoring his fields to a condition fit for cultivation? Indeed, if this be the law of the land, far better would it be for us to be ruled with Asiatic despotism, (for then we should know we were slaves,) rather than live in a land of freedom, of written constitutions, guaranteeing to every citizen the enjoyment of his property, with assurance that

Bloodgood *v.* The Mohawk and Hudson Railroad Company.

it shall not be taken from him but upon just compensation, yet holding it upon so frail and precarious a tenure as the whim or caprice of a legislature, which would render our condition still more intolerable.

In *Jackson* v. *Winne's Heirs*, (4 *Litt. R.* 328,) it was held that it was not competent to the legislature to take or apply to public use the property of any individual, without just compensation being *previously* made therefor ; and Parker, Ch. J., in *Stevens* v. *The Proprietors of the Middlesex Canal*, (12 *Mass. R.* 468,) said : " If the legislature should, for public advantage and convenience, authorize any improvement, the execution of which would require or produce the destruction or diminution of private property, without affording at the same time means of relief and indemnification, the owner of the property destroyed or injured would undoubtedly have his action at common law against those who should cause the injury, for his damages. For although it might be lawful to do what the legislature should authorize, yet, to enforce the principles of the constitution for the security of private property, it might be necessary to consider such a legislative act as inoperative, so far as it trenched on the rights of individuals." (See also *Callendar* v. *Marsh*, 1 *Pickering*, 431.)

Upon the whole, I am of opinion that an action of trespass well lies in this case, and that the defendants' plea is radically defective, in that it does not aver payment made to the plaintiff for his land, in one or the other of the modes prescribed by the act, and that the judgment of the supreme court, based upon contrary principles, should be reversed. The decision, on this point, in my judgment, disposes of this case.

The chancellor, however, at the argument, desired the court to pass distinctly on the question, whether the law incorporating the defendants was a constitutional law, and as a sufficient number of the members of the court had manifested their assent to the proposition of the chancellor, I shall proceed very briefly to consider that question. I might perhaps be permitted to observe, that little remains to be said after the very able and elaborate argument of the counsel in the case of *Beekman* v. *The Saratoga and Schenectady Railroad Company*, (3 *Paige*, 45,) and the no less able and satisfactory opinion of the present chancellor, delivered on that occasion. Indeed, after the decision of that case, I had supposed there was no longer any room for doubt upon the subject. Doubts, however, it seems, do exist, and it is meet and proper that that question should be put at rest by an express adjudication of this court. *Vattel*, (*Book* 1, *ch.* 9, § 100,) says : " The utility of highways, bridges, canals, and in a word, of all safe and commodious ways of communication, cannot be doubted. They facilitate the trade between one place and another, and render the conveyance of merchandise less expensive, as well as more certain and easy. The merchants are enabled to sell at a better price, and obtain preference ; an attraction is held out to foreigners, whose merchandise is carried through the country, and who diffuse wealth in all places through which they pass. § 101. One of the principal things that ought to employ the attention of the government, with respect to the welfare of the public in general and of trade in particular, must then relate to the highways, canals, &c., in which nothing ought to be neglected to render them safe and commodious. § 103. The construction and preservation of all these works being attended with great expense, the nation may very justly oblige all those to contribute to them who receive advantage from their use. This is the legitimate origin of the right of toll."

These propositions have the ready assent of every enlightened individual in every country, and under any and every kind of government. In the days of Vattel there were no railroads, and in all probability the obligation of government to construct railroads in no measure entered into his consideration when inditing those general propositions ; they nevertheless come within the spirit of national obligation in a most emphatic manner, as the government are thereby most effectually enabled to fulfil the just expectations and serve the most substantial

interests of the community.   That the government have not only the power, but
that it is most emphatically their duty and interest, to construct railroads where
the public interest and convenience demand them, cannot admit of a doubt; for
such purpose they are authorized to take private property, upon rendering just
compensation; and they are in like manner justified in exacting toll from those
who travel on them, as a mean to reimburse the state for the expense of their
construction and reparation.   I apprehend no one will be disposed to doubt or
question the truth of these propositions.   This state, as well as many, if not all
of the states of this union, have, since the foundation of the government, exer-
cised this rightful power in the construction of canals, some in the construction
of railroads, and all in authorizing the construction of turnpike roads and
bridges, and the establishment of ferries.   Bridges and ferries are *publici juris*
and turnpike grants are made on the hypothesis that lands taken for the road
are taken for public purposes.   (7 *Pickering,* 496.  2 *N. Hamp. R.* 25.  20 *Johns.
R.* 742, 743.)   If, however, the state shall not deem it wise or expedient, at its
own expense to construct a railroad, can there be any doubt of its power to
impart this authority to others?   I know of no instance in which this state has at
its own expense constructed a turnpike road, and yet our statute books are filled
with turnpike grants; and who has ever called them in question?   Indeed, upon
the argument here, as on all other occasions, it has ever been conceded that the
legislature have an undoubted constitutional right to charter a turnpike com-
pany, and to authorize the company to take private property on which to con-
struct their road, upon rendering just compensation.   Such concessions
having been always made by the most eminent counsel, and having been     [48]
sanctioned by the most learned judges on constitutional law, practised upon
and acquiesced in since the organization of our government, present such an
exposition of the constitution, and so ratify the exercise of this legislative power
under it, that the courts will not shake or control it.   (*Stuart* v. *Laird,* 1 *Cranch,*
299.)   Railroads are constructed for the same purposes and with the same
objects as turnpike roads, to facilitate travel and the transportation of property,
and the receiving of toll for such travel and transportation.   The grant of an
exclusive right to toll, as well on railroads as on turnpikes, is the consideration
by which individuals are invited to expend money in their construction, and to
assume the hazard of their being profitable enterprises.   (*Newburgh Turnpike
Company,* 5 *Johns. Ch. R.* 112.)   Whether the toll be received by the state, or
by the corporation, cannot affect the character of the road for public usefulness,
any more than the receipt of toll at bridges and ferries fixes the character of
those works.   Railroads are not only of great public use in the ordinary business
transactions of the citizen, but they may be more advantageously used than turn-
pike roads for national purposes; for the transportation of troops and munitions
of war at times when rapidity of transportation may be of vital importance to
the safety of the republic; for the transportation of mails, and the rapid dissemi-
nation of intelligence, which is the life of liberty, and more than any other mode
of conveyance, they tend to annihilate distance, bringing in effect places far dis-
tant near to each other; tending in their magic influence to the extension of per-
sonal acquaintance, the enlargement of business relations, and cementing more
firmly the bond of fellowship and union between the inhabitants of the states.
Next to the moral lever power of the press, should be ranked the beneficial
influence of railroads in their effects upon the vast and increasing business rela-
tions of the nation, and the promoting, sustaining and perpetuating the happiness,
prosperity and liberty of the people.

   It is insisted that laws authorizing the construction of railroads are not     [49]
constitutional, because the citizen cannot travel upon them with his own
carriage, when and as he pleases.   Admit the fact to be so, are railroad laws to
be deemed unconstitutional for this cause?   Laws authorizing the construction
of canals and turnpikes, are conceded to be constitutional; yet can no citizen

Bloodgood v. The Mohawk and Hudson Railroad Company.

travel on either of these with such vehicles as he pleases; he cannot use the canal with a boat of a size or structure different from what has been or may be prescribed by the canal commissioners; he cannot be permitted to use it with a steamboat, destroying the embankments by the commotion of the waters which its wheels would create; he cannot travel a turnpike with a vehicle which would occupy the whole road, thereby preventing other citizens from passing thereon. The convenience of travel, the safety of the citizens, and the accomplishment of all the ends designed by all public improvements, require the adaptation to each particular mode of travel of such vehicles of conveyance as are fit and suitable for the purpose. An individual cannot travel the canal with a four-wheeled carriage; nor a railroad with a canal boat. Not only are the vehicles to be adapted to each particular mode of travel, but their use is, and necessarily must be, subjected to such salutary regulations as the public interests shall require, to secure to every citizen an equal, convenient and safe participation and enjoyment of the improvement. In the nature of things, it cannot be permitted that every citizen shall have a right to place upon a railroad his own car and locomotive. The objects designed to be attained in the use of railroads, is the expedition and safety of conveyance; and in these the whole community have a deep interest, which must ever be considered paramount, and to which individual interests must yield. (4 T. R., 796.) It is obvious to the observation of all men, that if every individual should be at liberty to travel a railroad in his own car, there necessarily and unavoidably would be a great destruction of property and life; and the great ends which these improvements were designed to accomplish would be [50] totally frustrated and destroyed. But because individuals may not in their own way use them, they are not the less public improvements; they are not the less of great public use, and do not less subserve the great interests of the community at large. The laws authorizing their construction, are, in my judgment, constitutional, provided a just compensation be made, or most certainly secured to the individuals whose lands shall be taken for their construction and use; and inasmuch as the act incorporating the defendants, authorizes the company to take the plaintiff's land upon making him a just compensation therefor, that act is therefore constitutional. It was well remarked by Chief Justice Marshall, in *Fletcher* v. *Peck,* (6 *Cranch,* 128,) that "the question whether a law be void for its repugnance to the constitution, is at all times a question of much delicacy, which ought seldom if ever to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." (See also *Cooper* v. *Telfair,* 4 *Cranch,* 18, 19; *Bank of Newbern* v. *Taylor,* 2 *Murphy's N. C. R.,* 266.)

It is objected to the constitutionality of this law, that the value of the property taken for the road is directed to be assessed by *commissioners,* and not by a *jury;* and that the provision of the constitution of this state, declaring " that no person shall be deprived of his property without due process of law," is violated. It does not follow, as is contended, that these damages are to be assessed by a jury in court. If this rigid construction should prevail, the decrees of the chancellor and of the vice-chancellors, and the judgments of courts of record on the reports of referees, whereby property, both real and personal, to an immense amount is sold by execution, and the title of one citizen thereto transferred to another, must be adjudged unconstitutional and void. It is [51] unnecessary to enlarge on this point, as common sense and express judicial decision in this court, (*Livingston* v. *Mayor of New York,* 8 *Wendell,* 102,) and the practice of this state since 1797, (3 *Greenleaf's ed. of Laws,* 286,)

Bloodgood v. The Mohawk and Hudson Railroad Company.

and of almost every state in the union, have adopted this mode of assessing the damages of owners, where lands have been taken by authority of the government for public use, as the most convenient and best fitted to ascertain and fix that amount of just compensation to which the owners may be entitled. There is no question in dispute as to whom the property belongs, requiring judicial decision or the interposition of a jury; it is only in cases of controversial difficulties between citizen and citizen, that this part of the constitution has application. In such cases, the right of the litigant parties to the property in controversy, is to be determined by due course of law. (*See Barker* v. *Henry, Paine's C. C. R.* 565; *Cooper* v. *Telfair,* 4 *Cranch,* 18.) But where the property of the citizen, acknowledgedly his, is taken by the government for public use, the only point of inquiry is, what is the value of the property taken, or the amount in damages which is to be paid to the owner, as a just compensation therefor. The mode in which those damages are to be ascertained, is not prescribed in the constitution, and is by necessary consequence left to legislative discretion. (*Livingston* v. *Mayor of New York,* 8 *Wendell,* 102.)

It is further objected, that the company are not obligated to carry passengers or property, nor are they compelled to keep their road constantly in repair. This is an objection which might, perhaps, be successfully urged, were we acting in a legislative capacity; but it certainly can have no influence in any decision to be made as to the constitutionality of the law. The public, however, are not remediless as against the evils suggested. The chancellor has full and ample power to correct any violation of the letter or spirit of the act, and to reform any abuses the company may venture to practice on the community. (4 *Wheaton's R.,* 676.) And superadded to this, the legislature have reserved to themselves the right to alter, amend or modify the act of incorporation.

Giving to the act incorporating the defendants, the construction I have     [52] given it, in relation to their obligation to make just compensation to the owner, *before* his land can be used and occupied in defiance of his rights, I have no hesitancy in saying it is a valid and constitutional law. If, however, the court shall determine that such construction shall be given to it as will authorize the defendants to use and occupy this land without making just compensation, in one of the modes directed by the act, then I am equally clear in saying that it is unconstitutional and void.

*By Senator* Tracy. The first question in this case is, whether the proviso in the 7th section of the act incorporating the defendants is matter precedent or subsequent; that is, whether it contemplates that the railroad company should make compensation for the lands necessary for the construction of their road *before* they took possession of and converted them to their use, or merely imposes an obligation to pay for such lands as they should have taken possession of and converted to their use. If the first is the true construction of the proviso, then the plea is bad, for no principle of pleading is better settled than that where the authority relied upon for defence is dependent for its existence on a precedent act or event, the performance of that act or the occurrence of that event must be shown by the party seeking to justify under the authority; and this indeed is nothing more than saying, that a party seeking to justify, must show sufficient matter to justify. If, however, the proviso of the 7th section is merely an obligation on the defendants in case they shall have entered, and not a condition on the performance of which they may enter, then the plea is sufficient, if the legislature had the power of conferring upon the defendants the authority which the act expresses.

If the construction that should be given to the proviso in connection with the whole act be doubtful, there are two considerations which should incline the court to regard it as a condition; one is, that powers granted by the legislature to corporations or to individuals, in derogation of common right should be construed strictly, and not extended beyond

[53] what is clearly expressed, and especially where the power claimed is derogatory to private property. The other consideration is, that of avoiding a construction which imputes to the legislature an attempt to exercise a power forbidden by the constitution ; for mutual respect as well as public policy demands, that conflicts of opinion between different departments of the government, on questions of constitutional power, should in all possible cases be avoided. But it is only in case of some reasonable doubt of the meaning of the legislature, founded in the language of the act, that these considerations should control courts in their exposition ; for if consequences are to govern in the interpretation of a statute, notwithstanding its meaning is distinctly expressed by appropriate words, it will follow that courts, through an excessive solicitude to screen the legislature from the imputation of occasionally transcending its constitutional powers, will get habitually to transcend their own constitutional powers,—and converting judicial into legislative functions, inflict a hundred wrongs where they remedy one. Although judges should charitably presume, in the absence of clear evidence to the contrary, that the legislature has not intended to derogate from common right, much less to transcend its constitutional powers, yet they must not forget that many very beneficial statutes are in derogation of common right, and that all legislatures are liable, through inadvertence or misconstruction, to exceed their constitutional powers.

The power accorded to our judicial tribunals of pronouncing upon the constitutionality of laws, is essentially original to the institutions of this country ; at any rate, peculiarly appropriate and indeed indispensable to the adjustment and regulation of the action of a government purely democratic. The exertion of this power imposes upon the judiciary a delicate and often an unwelcome responsibility ; but it is in the firm and fearless fulfilment of this responsibility that is found the most powerful if not the only effectual barrier that can be erected against the tyrannical exercise of political power. We are not at liberty, therefore, in the present case, to pervert the plain language, or disregard the [54] explicit expressions of the statute, either from considerations of the hardships it may work to individuals, or from motives of delicacy, or feelings of respect towards the authority that enacted it ; but if, on careful examination, we find its meaning and intention to be clear and positive, we must give effect to them, if that effect be constitutional, and if it be not, it is our province and duty explicitly to say so.

The act, in the most direct terms, authorizes the defendants to cause such surveys and examinations to be made as they should deem necessary to determine the most advantageous way or course in which to construct their railroad, and then expressly declares that it shall be lawful for them to enter upon, and take possession of and *use* all such lands and real estate as may be indispensable for the construction and maintenance of their railroad ; and then comes the additional enactment, that lands *thus taken possession of and used by* the corporation, which are not donations, shall be purchased by the corporation of the owners, at a price mutually agreed upon ; and if the parties cannot agree, commissioners are to be appointed to determine the damages which the owners of the lands *so entered upon by the corporation have sustained by the occupation thereof,* &c.

If we confine ourselves to the language of the statute, and disregard all considerations of convenience or supposed necessity, which, from the nature of the subject the legislature must be supposed to have had in view, it would be difficult to find words which would more distinctly authorize the defendants to enter upon the lands required for the construction of the road, in the first instance, and previously to any effort to obtain them of their owners by purchase or appraisement. And when we come to the provision enabling the defendants to obtain the fee of the lands, no language could more aptly express the intention of the legislature that it was only of those lands, in the use and occupation of which the defendants already were, that the fee could be obtained.

Bloodgood v. The Mohawk and Hudson Railroad Company.

It seems to me it would be inverting the whole order of proceedings authorized by the statute, and destroying the sense of the proviso to say that " the damages which the owner or owners of the land so entered upon by the said corporation has or have sustained by the occupation thereof," [55] should be determined before they had been sustained. In the language of the supreme court, "It was obviously the intention of the legislature to authorize the corporation to enter upon and take possession of such land as they should think necessary for the route and construction of their road, without requiring as a condition precedent that the same should be (first) appraised and paid for." The reasons given by that court for this conclusion, founded on the nature and circumstances of the undertaking, are forcible and satisfactory, and in connection with the words and the order of the words of the act, do not justify imputing to the legislature an intention of which they have afforded no evidence, and which I cannot conscientiously say I think they entertained. A bare opinion that if their attention had been directed to the subject, as ours has been, they would have withheld or modified the power which their act bestows, is no warrant for me to do so. We are to be governed by the law as it is made, and not by speculations of what law would have been made, had the legislature contemplated the subject in the new aspects in which it is presented to us. I feel constrained, therefore, to decide, that the plea in this case contains sufficient matter to justify the entry and occupation by the defendants, if the act conferring this right be constitutional.

Whether the act be or be not constitutional, is the next and by far the most interesting point of this case. The act is alleged to be in conflict with the provision of the constitution of this state, that private property shall not be taken for public use without just compensation. And under this point two questions arise : 1. Whether the use of the property by the defendants, for the purposes of a railroad, is a public use within the meaning of the constitution; and 2. Whether a just compensation for the property is secured to the owner. It is necessary that both these questions should be answered affirmatively in order to sustain the constitutionality of the law. But as I am clear in the opinion that the latter question cannot be answered affirmatively, it does not, in my view of the case, become necessary to determine absolutely the answer that should [56] be given to the other question; and I am the less disposed to assume unnecessarily the present decision of it, not only because it is one of the most difficult, and perhaps altogether the most important question that has ever been presented to this court since I have been a member of it, but also because the limited opportunity which I have had since the argument for its examination, does not assure me that I fully comprehend and accurately estimate all the considerations that should be regarded in the final disposition of it. But still, as the question, if not now definitely settled, will probably soon come here again, and in a form to require a direct decision, I feel that it may not be improper, nor wholly useless, to present, though in an imperfect form, a few considerations which some reflection upon the subject has suggested to my mind.

It has never been allowed to be a rightful attribute of sovereignty in any government professing to be founded upon fixed laws, however despotic the form of the government might be, to take the property of one individual or subject, and bestow it upon another. The possession and exertion of such a power would be incompatible with the nature and object of all government ; for it being admitted that a chief end for which government is instituted is, that every man may enjoy his own, it follows necessarily that the rightful exertion of a power by the government of taking arbitrarily from any man what is his own, for the purpose of giving it to another, would subvert the foundation principle upon which the government was organized, and resolve the political community into its original chaotic elements. This power, therefore, instead of being acknowledged, was expressly repudiated by the Roman law at the height of imperial

despotism; so that even when the lives of subjects were wantonly sacrificed by thousands at the remorseless bidding of cruel and capricious tyrants, no idea seems to have been entertained that they could, except by the interposition of legal forms, transfer the property of one subject to another. Even *Hobbes*, the most ingenious of all advocates for the absolute powers of government, does not [57] go further with his doctrine on this point than to say, that the property which a subject has in his goods, consists not in a right to exclude the sovereign from the use of them, but consists in a right to exclude all other subjects from the use of them. But no approved writer on public law will be found to go as far as Hobbes in vindicating the unqualified right of the sovereign to assume at will the property of the subject. Every other writer is disposed to recognize a distinction between right and power as applied to sovereign and subject, and to acknowledge that a rightful government must be founded on some other principle than that of mere force. Hence an original compact, founded in the mutual necessities of the individuals about to constitute a political community, is implied in all cases, and the respective rights of sovereign and subject are referred to this supposed compact for their ascertainment. It follows, of course, that as the terms of this compact are capable of being shown only argumentatively, differences of opinion will exist in regard to them. To avoid this difficulty, is one great purpose of written constitutions. But though differences of opinion exist as to the extent of the principle of the inviolability of private property, the secure possession and undisturbed enjoyment of property by individuals, is universally admitted to be the great cement of the social compact, and every publicist therefore feels the necessity of prescribing some safeguards for it against the encroachments of the sovereign power. At the same time all are ready to acknowledge it to be a principle of the social compact, assented to by the original members of it, that in public emergencies the right of individuals over their property must yield to the superior necessities of the state. Whether this principle be denominated the right of transcendental propriety, or of eminent domain, or as is more properly by Grotius, the force of supereminent dominion, it means nothing more or less than an inherent political right, founded on a common necessity and interest, of appropriating the property of individual members of the community to the great necessities of the whole community. This principle [58] or right does not rest, as supposed by some, upon the notion that the state had an original and absolute ownership of the whole property possessed by the individual members of it, antecedent to their possession of it, and that their possession and enjoyment of it being subsequently derived from a grant by the sovereign, it is held subject to a tacit agreement or implied reservation that it may be resumed, and all individual rights to it extinguished by a rightful exertion of sovereign power. Such a doctrine is bringing the principles of the social system back to the slavish theory of Hobbes, which however plausible it may be in regard to lands once held in absolute ownership by the sovereignty, and directly granted by it to individuals, is inconsistent with the fact that the security of pre-existing rights to their own property is the great motive and object of individuals for associating into governments. Besides, it will not apply at all to personal property, which in many cases is entirely the creation of its individual owners; and yet the principle of appropriating private property to public use, is full as extensive in regard to personal as to real property. But in whatever this principle is founded, the difficulty is not the less in determining the limits that rightfully bound it. On this point, the writers upon public law are not agreed, nor is any one of them, that I have been able to consult, satisfactory; for, while all admit that the sovereign or transcendental propriety consists in the right of taking the property of individuals for the necessities of the state, no one succeeds in defining clearly the degree of necessity that justifies the exertion of this right; perhaps, from the nature of the case, such a definition is impracticable. (*Grotius, Lib.* 3, *c.* 20, § 7,) asserts that the power can be asserted rightfully, not

Bloodgood v. The Mohawk and Hudson Railroad Company.

only in cases of extreme necessity, but for those of public utility, (*ob publicam utilitatem*,) while *Puffendorff* says, that "transcendental propriety never takes place but in the extremities and necessities of the commonwealth;" and yet he quotes from *Bœcler* what he says in his commentaries upon Grotius, "that this necessity hath its different degrees, and that it is not only in the last extremity this power should be made use of," though Bœcler admits "that it should not be extended too far, but should be reduced to equity as nigh as pos-    [59] sible." *Bynkershoeck* insists that private property cannot be taken on any terms, without the consent of the owner, for purposes of public ornament or pleasure; and *Burlemaque*, in his *Principles of Law*, 145, speaks of this right as not to be exercised, "except in cases where it is absolutely necessary for the public good;" and again, *p.* 150, that "it takes place only in a case of necessity of state, which ought not to have too great an extent, but should be tempered as much as possible with the rules of equity."

No doubt it was in full view to the discordant opinions expressed by writers on public law, in regard to the application of the principle of supereminent dominion, and with a matured design of affording special and additional protection to the citizen against the exertion of it by the government, that the framers of our national constitution adopted the clause in question; and it is reasonable to presume, that from the same motives and for the same object, it was transcribed literally from that instrument into the present constitution of this state. In both instruments, it is designed to be as well a limitation as a definition of the right of the respective governments as sovereign political powers, to interfere with the otherwise absolute right of the citizen to the undisturbed possession and enjoyment of his own property. It is therefore, I think, to be construed in both cases as equivalent to a constitutional declaration, that private property, without the consent of the owner, shall be taken only for the public use, and then only upon a just compensation. It is not very certain that the constitution of the United States contemplates by this provision any other than a direct use by the government itself through its officers, and for the purposes of the government as a political being; as in cases of impressment for military service, or the taking of lands for forts, light-houses, dock-yards, &c.; and it may be doubted whether the national government has the power by virtue of sovereignty, to take private property, without the consent of its owner, for the purpose of dedicating it to a popular public use, by which is meant a use by the people generally as individual beings, as for a common highway. If it be correct    [60] that the constitution of the United States does not reach a case of a mere popular use, but is restricted in the meaning of public use to a use by the government as an organized political being, a question possibly might arise whether the same words transferred to the constitution of this state, are to be restricted to the same meaning, and whether the introduction of them into our constitution does not so far operate as a new limitation of the powers of the state functionaries, as to make the legislative acts, appropriating private property, passed previously to the new constitution, at best but questionable precedents for those that may be passed subsequently to its adoption. But admitting that the general welfare, and even imperative public necessity, require such a construction of legislative power as shall authorize the appropriation of private property, not only for the use of the state in its political character, as in the case of canals or other public works, where the whole property remains in the state, but also for the use of the people distributively, or as individual members or parts of the political community, as in case of highways, streets, squares, &c., we are then to inquire, 1st, whether the term *public use*, is not in either case to be confined to its simple sense of *direct* possession, occupation and enjoyment by the public; and 2d, is not the power of taking private property for public use, in any event, such an attribute of sovereignty that it must be exercised directly by the sovereignty acting through public political agents and cannot be delegated to individuals or

corporations, not public political agents, to be by them exercised at their own discretion and for their own benefit.

When we depart from the natural import of the term "public use," and substitute for the simple idea of a public possession and occupation, that of public utility, public interest, common benefit, general advantage or convenience, or that still more indefinite term public improvement, is there any limitation which can be set to the exertion of legislative will in the appropriation of private property. The moment the mode of its use is disregarded, and we permit ourselves to be governed by speculations, upon the benefits that may result to localities from the use which a man or set of men propose to make of the property of another, that moment we are afloat without any certain principle to guide us. One man, unwisely, perhaps, prefers to suffer his lands to lie unoccupied, or his water power to remain unimproved, which another is anxious to convert to uses highly advantageous to the public. On what principle shall a law, transferring the title from the owner to his more enterprising neighbor, on the payment of a just compensation, be pronounced unconstitutional, if using property beneficially to the public is to be deemed a public use of it? The remark of an eminent jurist, (2 *Kent's Comm.*, 340,) that "it must undoubtedly rest in the wisdom of the legislature to determine when public uses require the assumption of private property; and if they should take it for a purpose not of a public nature, as if the legislature should take the property of A. and give it to B., the law would be unconstitutional and void," is correct, if intended to concede to the legislature merely the power of determining what property in a particular case shall be taken for the public use; but it cannot be correct if intended to concede to the legislature the power of determining what constitutes a public use of private property; and therefore I must dissent from the position taken by the chancellor in *Beekman* v. *Saratoga and Schenectady Railroad Company*, (3 *Paige*, 73,) where he says: "If the public interest can be in any way promoted by the taking of private property, it must rest in the wisdom of the legislature to determine whether the benefit to the public will be of sufficient importance to render it expedient to exercise the right of eminent domain, and to authorize an interference with the private rights of individuals." This position, it will be seen, disregards the distinction between a public use and a public interest in a particular use of private property, and confers on the legislature the right of determining, first, that the public interest will be promoted by the particular use of private property; and next, because the public interest will be promoted by such use, that therefore it is a public use; and finally, it being a public use, it becomes a mere question of expediency with the legislature whether they shall authorize private property to be taken to subserve it or not. It seems to me that such a construction of legislative powers is inconsistent with the secure possession and enjoyment of private property, and repugnant to the language and object of the constitutional provision. Indeed it concedes to legislative discretion a wider range than I think could be maintained for it on the principles of natural law, if we had no written constitution.

It is not denied that the legislature is the most appropriate organ of the sovereignty of the state for exercising the right of eminent domain, but they can only exercise right or power in subordination to the constitutional authority; which authority they cannot enlarge or modify. The condition that the property must be taken for public use is as much above their reach and control as it is above the reach and control of the lowest functionary of the government, who, like them may have occasion to invoke this attribute of sovereignty in an emergency of some humble department of the public service, with which he may have been charged. The legislature may fitly determine when and under what circumstances—as to the mode of taking—private property shall be taken for the public use. But it by no means follows, as seems to have been supposed, that the legislature can determine that a particular use is a public use of private property, within the

Bloodgood v. The Mohawk and Hudson Railroad Company.

meaning of the constitution. The nature of the use to which the legislature may dedicate the property of a citizen, is not established by the name which they give to it, but is an inherent and inseparable quality or characteristic which cannot be changed, however it be denominated. Much less are we to confound the notion of legislative discretion with that of sovereign power. The legislature is not the sovereignty of the state, but only one of the organs of the sovereignty, and a restricted organ in regard to all matters prercribed by the constitution, and necessarily, therefore, cannot exercise any power which by the fundamental compact is prohibited to the sovereignty. It is prohibited to the government of the state, even in its sovereign capacity, to take private property except for public use; consequently it is not in the power of the legislature to authorize private property to be taken for any other [63] purpose. Nor can this restriction, which is upon both the government, as a sovereignty, and upon the legislature, as its organ, be evaded, or the power which it limits be extended, under whatever form or by whatever name it may be attempted. If it be called the right of eminent domain, or of supereminent dominion, it comes to the same result, for these are only other names for sovereign power, and are equally included and controlled by the constitutional restriction. Therefore, to insist that the determination or expression by the legislature that it is for the public interest and expedient in a particular case to exert the right of eminent domain, or the power of sovereignty, *ipso facto*, establishes that the power of sovereignty is rightfully exerted, is in effect to insist that the power of the legislature is above the power of the constitution, and to prove that instead of possessing a government of defined and limited powers, we have one with powers more extensive and irresponsible than those of the regal governments of Europe. But happily for us, this is not so; the legislature is not the creator or judge of its own powers, but is the creature of the constitution, and all its acts must be in subordination to it. In the examination, therefore, of a question involving the construction of constitutional powers, courts are to be guided by the constitution itself, and are not to be controlled by the acts of the legislature, or to be further influenced by them than a due respect for the apparent opinions of a co-ordinate branch of the government may demand. Conceding freely to the legislature the right of appropriating private property to the public use, but denying confidently to it the power of making that a public use which in its nature is not, the question recurs, whether the use by the defendants of the lands taken from the plaintiff for the purpose of constructing thereon a railroad, to be owned and possessed by them as a corporation, is that public use for which alone private property can be taken?

It can scarcely be urged that the mere circumstance that the defendants are a corporation, makes their case different from what it would be, were they a simple association or copartnership; for the shareholders or proprietors are [64] equally private citizens and no more public agents in a political sense, in the one case than in the other. Their obligation to the public and their liability to individuals, whatever that obligation and liability may be, are not affected by the fact of being incorporated; for had the legislature granted to enumerated individuals without the forms of incorporation, the same privileges and powers, their duties and responsibilities would have been the same. A franchise may be granted to persons in their natural capacity as well as to them in a corporate capacity. The road, therefore, is none the less the private property of the defendants; and the construction, possession and occupation of it are none the less for private emolument, than it would be were the owners of it unincorporated. In looking at the question in this aspect, it will be found essentially disembarrassed from all other considerations than such as relate to the fact, whether railroads, built, owned and possessed by individuals, but for the purpose of transporting for pay, such passengers as may desire to be transported on them, are for that reason public roads, or roads in the making of which the public in its sovereign sense, has that degree

Bloodgood *v.* The Mohawk and Hudson Railroad Company.

and description of interest, that private property may be taken without the consent of its owner, for the purpose of constructing them, on the principle that it is thereby appropriated to the public use. The argument in support of this position rests mainly on the ground that railroads are public improvements, the advantages of which are available by every person who seeks them, and that they are not distinguishable from public highways, and especially not from turnpike roads. This position is also attempted to be fortified by the circumstance that the privilege of making a road and taking tolls is a franchise, and as such is subject to be regulated and restricted by the legislature.

It is not to be doubted that railroads are in many cases public improvements of great value and usefulness; and when limited in number and extent to the means and wants of the country, productive of an increase of comfort and convenience to individuals, and of wealth and power to the communities in which they exist, and that such is the character of the particular railroad owned by the defendants in this case, should be freely admitted. But is this enough to justify the conclusion, that because the use to which it is dedicated by its owners, accommodates individuals, and thereby advances the public interest, therefore it is such a public use that private property may be taken to promote it. Can the constitutional expression, public use, be made synonymous with public improvement, or general convenience and advantage, without involving consequences inconsistent with the reasonable security of private property; much more with that security which the constitution guarantees. If an incidental benefit, resulting to the public from the mode in which individuals in pursuit of their own interest use their property, will constitute a public use of it, within the intention of the constitution, it will be found very difficult to set limits to the power of appropriating private property. It is hardly necessary to illustrate by supposed cases the extent to which such a doctrine could be legitimately carried. A person anxious to establish a line of stages for the public accommodation, certainly might ask the interposition of the legislature to enable him to appropriate his neighbor's horses for the public use; and even in the present case, the legislature might have authorized the corporation to take personal property, such as horses, cars, &c., which was necessary for the maintenance of their railroad, on the same principle as that on which rests the authority to take the lands of the plaintiff. It is not sufficient to say that the legislature will exercise this power of appropriating private property with discretion. when the inquiry is, whether the security of the citizen rests in the discretion of the legislature, or in the guaranty of the constitution.

The circumstance that the privilege of making a railroad and taking tolls thereon is a franchise, seems to me to have less force in determining this question than has been attributed to it. All corporate privileges are franchises, and the use of them may be regulated or restricted by legislation as much as the franchises of railroad corporations. Banking corporations, insurance corporations, and many others, are franchises, and the grant of them has been as distinctly on the ground of promoting the public interest, as the grant of railroads. In every sense bearing on this question, a license to keep a tavern is a franchise, and the obligation of the tavern-keeper to the public and to individuals is as defined and as extensive in its nature as that of a railroad company; and there is the additional analogy of the license being granted for public accommodation and benefit. But when we come to cases like these, the distinction between the taking of private property for public use, and the taking of it for an individual use, beneficial to the public, becomes marked and obvious.

I find only one decision, out of our state, that palpably confounds this distinction, and this was by a court in Tennessee, where it was held that under a law passed in 1777, the land of one citizen could be taken for the use of the mill of another, on the ground that the mill was necessary for the neighborhood, and the miller a public agent. But even this is founded on assumptions not maintain-

Bloodgood v. The Mohawk and Hudson Railroad Company.

able in this case; and how far it was influenced by the consideration that the act authorizing the appropriation was anterior to the constitution of the state, does not appear. If, however, it decides the general proposition, that the legislature can appropriate the land of one citizen to make a mill-dam for another, it must also in effect decide the more startling proposition, which I am sure neither the courts nor the people of this state are prepared to admit, that the legislature can transfer the unimproved mill site of one citizen to another, for the purpose of enabling the latter to build a mill for the public accommodation. The case, (3 *Fairfield*, 233,) turns on the point, that it is no objection to the power of appropriating private property to the public use by the legislature, that the measure contributes also to the emolument and advantage of individuals or corporations—a position which in the present case it is not important to examine.

The distinction between the taking of private property for a canal or other works owned by the state, or for a common public highway, and the taking of it for a railroad to be owned by a corporation or by individuals, is too obvious to need particular illustration. But the distinction between taking private  [67] property for a *turnpike road* and the taking of it for a *railroad*, is certainly much less so. It is indeed not easy to draw the line, for at some points the two cases approximate and almost blend, so as scarcely to admit of separation. Still, I think, there is a distinction founded on sensible circumstances, and they who insist there is not, should bear in mind that by confounding them they do not necessarily prove that the power granted to railroad companies of appropriating private property is constitutional—they may only prove that the power granted to turnpike companies is not. This distinction will be seen, I think, both in the different modes of using the two roads and in the nature of the property which the respective companies have in them. In the case of turnpikes, it is not only that the use of them by all persons is unrestrained, and direct, in their own vehicles, with their own motive powers, and according to their own inclination as to time and speed; while in the case of railroads, the entire immediate use is by the owners of them, subjected to no rules but such as are prompted by a regard for their own interest or convenience. Also in the case of turnpikes, every person has the power and right of using the road so as to make the use of it a means of profit to himself, as by running carriages for the transportation of persons or property; while in the case of railroads, the immediate use of the road being with the proprietors of it, it can be a means of direct profit only to them. The property, also, which the companies have in the two descriptions of road will be found materially different. A turnpike company has a limited or qualified, and not an absolute estate in its road. The 16th section of the general turnpike law (1 *R. S.*, 584), and which is but a general enactment of a provision inserted in almost every previous turnpike charter, provides that every turnpike corporation, when it shall have been compensated all moneys expended, &c., with ten per cent interest, may be dissolved by the legislature, and then " all the rights and property of such corporation shall vest in the people of this state." The effect of this provision, it will be seen, is to secure the ultimate property of the road to the people, and to allow the corporation  [68] to keep the road, and levy tolls for the use of it, only until they are reasonably compensated for the moneys they have expended in its construction and maintenance. The corporation are *quasi* mortgagees of the road, in possession for the purpose of reimbursing themselves, by tolls, for the moneys advanced by them in that behalf for the public; and the case, in this respect, is not essentially different from what it would be if the state made these roads and imposed tolls for the mere purpose of obtaining repayment of the moneys expended, with interest, to compensate for the risk. In the one case as in the other, the public at large has a benefit in the reception of the tolls, inasmuch as their application must be to discharge the incumbrance which is on the road, and to make it in every sense a free public highway. It was no doubt in view of this peculiar

feature that Chancellor Kent observed, in *Rogers* v. *Bradshaw* (20 *Johns. R*, 742), " Turnpike roads are, in point of fact, the most public roads or highways that are known to exist, and in point of law they are made entirely for public use, and the community have a deep interest in their construction or preservation." But in the charter of railroad companies, especially the one now under consideration, there is no provision securing the ultimate property to the public. There is, to be sure, a right secured to the state of purchasing, within a prescribed period ; but which, until exerted, creates no reversionary interest in the state, and consequently the public has no benefit, direct or remote, from the earnings of the road, which, however much they may exceed the original outlay and interest and expenses, are still for the exclusive advantage of the proprietors.

The next inquiry in order which is suggested is, whether the taking of private property for public use, be not an act of sovereign power that can only be exerted directly through political agents or public officers, and cannot be delegated to private individuals or to a private corporation, for them to exert at their own discretion and for their own benefit ? That the defendants are a private corporation, as distinguished from a public or political corporation, will not [69] admit of any dispute. It is not sufficient to give a corporation the character of a public corporation, that its operations are beneficial to the public ; for in such sense almost every corporation having its origin in individual enterprise and its object in individual gains, would be denominated public ; and not only banks and insurance companies, but transportation and manufacturing companies be embraced. " Strictly speaking," says Mr. Justice Story, *Dartmouth College* v. *Woodward*, (4 *Wheat.*, 468, 494,) " public corporations are such only as are founded by the government for public purposes, where the whole interests belong also to the government, such as towns, cities, counties; but a bank whose stock is owned by private persons is a private corporation, although it is erected by the government, and its objects and operations partake of a public nature. The same doctrine may be affirmed of insurance, bridge and turnpike companies." It will be seen that the term public should be confined to corporations constituting political or municipal communities which are clothed with extensive civil authority, and have for their object the government of particular portions of the state. The *Civil Code of Louisiana*, tit. 10, ch. 1, art. 420, makes the only division of corporations into political and private. The first are those which have principally for their object the administration of the government of a portion of the state, and to whom a part of the powers of the government is delegated to that effect; and although such a corporation may have involved in it some private interests, yet as its principal object is the exercise of municipal or political functions, it seems to be appropriately termed a political or public corporation. The civil or municipal powers of such corporations may be regarded rather as distributions than as delegations of the sovereign powers of the political commonwealth of which they are organized parts ; for, being recognized by the constitution or original compact of the community, they possess within their prescribed spheres of action a right to the discretionary exercise of certain political faculties, which does not and cannot attach to a citizen or association of citizens, not distinctly clothed with a public official or political character. Town officers, for [70] instance, though elected by a local corporation, as a particular town, are in every sense public officers, and in their appropriate spheres of action, the legitimate organs or representatives of the sovereignty of the whole state, as much as the governor of the state when acting within his constitutional sphere ; and the exertion by them of the right of sovereignty to appropriate private property for a necessary public use, as land for a highway, or materials for repairing it, is as legitimate and as direct an exertion of the right of sovereignty, as the dedication of particular property to the public use by a legislative act. But this is a power or right which from the nature of the case, cannot be exerted by private individuals and consequently not by a private corporation through agents

Bloodgood v. The Mohawk and Hudson Railroad Company.

appointed by itself. They alone can exert it, who are public officers or political agents, or organs of the sovereign power. In this case, who is it that has taken the plaintiff's lands, and appropriated them for the purposes of the defendants? Not the legislature, for they have not in their act declared what lands, or that any lands belonging to the plaintiff, are to be appropriated; not any public officer or political agent, for no such officer or agent is designated or provided for by the act. It is not then on the exercise of the sovereign discretion by the legislature, or by any other agent or organ of the political community, or on any responsible and official judgment, that the particular lands belonging to the plaintiff were necessary for the public use, that they have been appropriated; but the appropriation has been made by a private corporation acting through its own agents, on its unofficial and irresponsible opinion or judgment that the lands were necessary for the uses of their railroad. The plea states that among other things it is enacted that the said corporation are authorized, by their agents, surveyors and engineers, to cause such examinations, surveys, &c., as should be necessary to determine the most advantageous route, &c., for the construction of *their* railroad, and that it should be lawful for the said corporation to enter upon, take possession of and *use* all such lands and real estate as might be indispensable for the construction and maintenance of *their* railroad, &c., and the  [71] accommodations requisite and appertaining thereto, &c.

This, it will be seen, is a delegation of a power of the sovereignty of the state ; not to public officers or to a political corporation, or even to designated individuals, but to a private corporation, to be by that corporation exerted according to its own judgment of its own necessities. This case must not be confounded with one where the legislature has appropriated, or directed to be appropriated, specific property to the public use ; nor with one where it has devolved upon subordinate political agents the power and duty of selecting and determining what property shall be appropriated to a particular public use, as in the case of the canal commissioners, or even in that of lands taken for a turnpike road. In the latter case, which has been supposed to be in strict analogy with the present case, it will be found that this political power is never proposed to be conferred on the corporation. Section 17 of the general turnpike law, provides that the road shall be laid out by commissioners appointed by the governor, who shall not be interested in the road, nor live in any county through which it passes. When, therefore, the lands of a citizen are appropriated for a turnpike road, it is upon the judgment and decision of public political agents of the sovereignty, and is therefore the act of the sovereign power. But here we find no judgment or decision upon the particular subject matter, by any person or tribunal in political relation with the government. Admit that the use of private property for the purposes of the railroad is a public use, and that the legislature could make the appropriation, has the legislature in fact made the appropriation? Certainly it has not passed on the fact, that any particular property should be taken for this purpose ; nor has any other agent or organ of the sovereign power passed on this fact. How then does it appear that the state, by virtue of its sovereign right, has resumed this particular property? It cannot be contended that the right of *eminent domain* in the sovereignty is an alienable right, and transferrable. It would be a solecism to say so. Yet it would seem to be on this notion  [72] only, that a private corporation through its own agents, could exert this great political prerogative. For unless it be assumed that the sovereign right of eminent domain was vested by the legislature in the corporation, to be by the corporation exerted according to its views of public necessities, it cannot be shown, that in respect to the particular premises in controversy, it has ever been exerted at all. And if this be assumed, it follows that the highest responsibilities of the government may be devolved on a moral non-entity, which, from its nature, is incapable of exercising political responsibilities.

But leaving the discussion of these questions, into which I have gone much

Bloodgood *v.* The Mohawk and Hudson Railroad Company.

further than I anticipated, I come to the examination of that point of the case in the decision of which I am clearly of opinion that the supreme court has erred. I mean the proposition that the act provides a just compensation to the owners for their property, taken without their consent. I have already expressed my concurrence with the supreme court, in the conclusion that the act incorporating the defendants, contemplates and authorizes an entry and possession for the purposes of survey and examination, and for the construction of the road, prior to compensating the owners, and prior to taking any measures to secure an ultimate compensation. It only remains, therefore, to see if under the act there is any mode by which the owners ultimately can obtain compensation, and if there be, whether such ultimate compensation is the "just compensation" which the constitution makes the indispensable condition for the taking of private property for public use. In construing the proviso of the 7th section in the nature of a condition subsequent, as has been done by the supreme court, and as I think the language and meaning of the whole act requires, there is room for doubt whether the corporation is bound to take any steps for ascertaining and compensating the damages occasioned by their entry and possession, unless they choose to obtain the fee of the land; at least it is questionable whether the owners of the lands possess any certain means for compelling them to do

[73] so. The act prescribes no time within which the corporation shall proceed to agree for the purchase of the lands, or to procure the appointment of commissioners to determine the damages, in case of disagreement; and it may not be easy to show that they could not as rightfully continue to use the road after it was constructed, without paying for the land, as they could take possession of the land without paying for it, for the purpose of constructing their railroad. But assuming, as it may be just to do, that the corporation is bound by the equity of the act to proceed to purchase the lands by agreement or by appraisement, within a reasonable time after the road is constructed, what will be the remedy of the owners if they do not? In strict law, the only remedy for the breach of a condition subsequent, is a re-entry upon the land. The breach of a condition subsequent, does not make the estate void without entry, as a limitation will. (*Co. Litt.* 218, [*a*]). It is unnecessary to show how far short of a just compensation, or an equivalent for it, such a remedy would be.

The supreme court suggests the idea that an unreasonable delay in acquiring the title, might render the corporation trespassers *ab initio*. But is this idea well founded? If the corporation had lawful authority to enter upon the lands of the plaintiff, and do the acts complained of previously to making compensation, there would be no occasion for them to do anything afterwards which could constitute them trespassers. *The Six Carpenters' case*, (8 *Coke*, 290,) which carries the doctrine of trespass *ab initio* to the extremest verge of sense or reason, does not reach a case like the present one. It is there ruled that *not doing* cannot make the party who has authority or license a trespasser *ab initio*, because not doing is no trespass. This sensible distinction is recognized in the case, (5 *Barn. & Cress.* 279) in which it is decided that it is only where the subsequent act is a trespass of itself, that the party can be made a trespasser *ab initio*. No argument seems necessary to show that where the corporation is lawfully in possession, under and for the purposes of the statute, a delay to acquire the fee would not be in itself a trespass, but at most a "not doing," within the meaning of the Six Carpenters' case.

[74] I confess I am not able to see as plainly as the supreme court seem to have done, that there can be no question but "that the plaintiff would have an ample remedy in some form of action;" and I regret that that court has not pointed out the particular form of action by which this ample remedy could be obtained. The counsel has attempted to supply the omission by urging the catholicon, *action on the case*, as affording this ample remedy. But I am not satisfied that the plea which has been put in would not be as available to an action

Bloodgood v. The Mohawk and Hudson Railroad Company,

on the case, as it undoubtedly would be in the present action, were the authority pleaded allowed to be constitutionally given. The difficulty in both cases is, that there is not a clear and certain obligation imposed on the corporation to proceed to ascertain and compensate the damages, unless and until they elect to acquire the fee of the lands.

But if it be admitted, that in the event of an unreasonable delay by the defendants to proceed according to the proviso to obtain the fee of the land, the plaintiff might maintain an action on the case, or otherwise, to recover his damages, the inquiry then recurs whether a subsequent and contingent right to an action at law to recover damages against corporations or individuals of undefined responsibility, is that "just compensation," without which the constitution declares private property shall not be taken. If it be, one is constrained to feel that our boasted constitutional guaranty, against the encroachments of the government upon the sacred rights of private property, is at best but solemn mockery—a provision "that keeps the word of promise to our ear and breaks it to our hope." Assuming that land taken for the construction of a railroad is taken for public use, as much as when taken for a canal owned by the state, or for a public road laid out by the town-officers under the highway act, or for a turnpike road, it is vain to seek an analogy in respect to the certainty of the compensation secured in the one case and in the others. In regard to lands taken for state canals or for common highways, the fund from which compensation is secured is a public one and certain, and the means for ascertaining the damages and for reaching the fund, are defined, specific, and at the command of the [75] party injured; and in regard to lands appropriated to a turnpike road, the statute requires not only that the damages shall be assessed, but actually paid or tendered before the lands can be entered upon by the corporation. I am aware of the intimation, by high authority, in *Jerome* v. *Ross*, (7 *Johns., Ch. R.*, 344,) that it is not necessary to the validity of a statute, authorizing private property to be taken for public use, that a remedy should also be provided for the owner of it to obtain compensation; but what was subsequently said by the same distinguished judge, (2 *Kent's Comm.*, 389,) affords reason for supposing that he doubted the correctness of this intimation. In speaking of the right of the government to take private property for public use, he says : " In these and other instances that might be enumerated, the interest of the public is deemed paramount to that of any individual; and yet even here the constitution of the United States, and most of the states of the union, have imposed a just and valuable check upon the exercise of legislative power, by declaring that private property should not ' be taken for public use without a just compensation.' *A provision for compensation is a necessary attendant* on the due and constitutional exercise of the power given to deprive an individual of his property without his consent; and this principle, in American constitutional jurisprudence, is founded in natural equity, and is laid down by jurists as an acknowledged principle of universal law." If it be not that a provision for compensation is an indispensable ingredient of a law appropriating private property to public use, then are the citizens of this country less secure in the possession and enjoyment of their property under constitutional guaranties than the subjects of the British government, whose rights are undefined by any written constitution, and whose political privileges are supposed by many to be entirely subject to the omnipotent legislation of parliament. *Blackstone*, speaking of the sovereign right of the legislature to take the property of a subject for public use, says, its interference in such a case is " not by absolutely stripping the subject of his property in an arbitrary manner, but by [76] giving him a full indemnification and equivalent for the injury thereby sustained. The public is now considered as an individual treating with an individual for exchange. All that the legislature does is to oblige the owner to alienate his possessions at a reasonable price, and even this is an exertion of power which the legislature indulges with caution, and which nothing but the legislature

43

can perform." (1 *Black Comm.*, 139.) I have always thought the decision in *Rogers* v. *Bradshaw*, (20 *Johns. R.*, 735,) went quite as far as could be reconciled with the letter or spirit of the constitution; but I have no disposition to question the correctness of that decision, and much less to deny that it is, just as far as that case goes, a settled judicial construction. But in acknowledging that the spirit of the constitution is complied with, if legal provision for compensation is made, though the party cannot avail himself of it till after his property has been taken, I cannot acknowledge, however high the authority may be to the contrary, that private property can be constitutionally taken, even for public use, under a law which does not provide a defined and certain mode for the owner of it to obtain a just equivalent. The argument, that a law appropriating private property, without the owner's consent, and which contains no such provision, is constitutional, simply on the ground that those having the benefit of another's property, are in justice bound to pay for it, and therefore the law will give the party an action to compel a compensation, is, to say the best of it, an argument which proves the constitutional provision utterly nugatory; for so far as legal remedy is supposed to be a necessary attendant upon an abstract right, it would be available as well without the constitution as with it. But if a law be constitutional, which takes from a citizen his property without expressly providing means for compensating him, it is not easy to show that he would have any legal remedy for obtaining compensation. If he had, however, a clear right to maintain an action, it seems very unreasonable to imagine, that a bare right to a remedy against an individual, and much less against a corporation where there is no individual liability, and, it may be, no corporate responsibility, [77] is that "just compensation" of which the constitution speaks. It cannot be that courts will attempt to refine the simple, plain and effectual security of the constitution, provided by the people themselves as a necessary safeguard for their property, against the eager hand of legislation, into that "most unsubstantial, unessential shade," a right of action.

I conclude, therefore, that in the present case, where there was no public fund, which in law and in fact must be deemed always adequate to insure the payment of such damages as shall be found to have accrued, that the legislature could not authorize the defendants to enter upon and possess and use the lands belonging to the plaintiff, until they had first paid, or offered to pay to him, a just compensation therefor; and that the plea in this case, containing no averment that compensation had been made or offered, is bad, and therefore the judgment of the supreme court which sustains the sufficiency of the plea, should be reversed.

On the question being put, *Shall this judgment be reversed?* the members of the court divided as follows:

*In the affirmative:* The Chancellor, and *Senators* Armstrong, Beckwith, Downing, Edwards, Fox, Lacy, Lawyer, Loomis, Maison, Powers, Spraker, Sterling, Tallmadge, Tracy, Van Dyck, Wager, Willes, Works—19.

*In the negative:* *Senators* L. Beardsley, Johnson, J. P. Jones, Livingston—4.

A *resolution* was then offered declaring, in substance, that the legislature of this state have the constitutional power to authorize the taking of private property for the purpose of making railroads or other public improvements of the like nature—whether such improvements be made by the state itself, or through the medium of a corporation or joint stock company—on making ample provision for a just compensation for the property taken, to the owners thereof. On the question being put, Shall this resolution be adopted? the members of the court divided as follows:

[78]     *In the affirmative:* The Chancellor and *Senators* Armstrong, L. Beardsley, Beckwith, Downing, Edwards, Fox, Johnson, J P

The Judges of the Oneida Common Pleas *v.* The People.

JONES, LAWYER, LIVINGSTON, MAISON, POWERS, SPRAKER, STERLING, TALL-MADGE, WAGER—17.

*In the negative:* Senators LACY, LOOMIS, WORKS—3.

Whereupon the following *judgment* was entered :

Counsel having been heard in this cause, and due deliberation being thereupon had, it is declared and adjudged that the legislature of this state has the constitutional power and right to authorize the taking of private property for the purpose of making railroads or other public improvements of the like nature, paying the owners of such property a full compensation therefor, whether such public improvements are made by the state itself or through the medium of a corporation or joint stock company ; but that by the true construction of the defendants' charter or act of incorporation, they were not authorized to take and appropriate the plaintiff's land to their use, for the purpose of making their railway thereon, until his damages were appraised and paid, or deposited for his use, as provided for in the act of incorporation. It is therefore ordered and adjudged, that the judgment of the supreme court in this cause, be, and the same is hereby *reversed,* and that the plaintiff be restored to all things which he has lost thereby ; and it is further ordered and adjudged, that the second plea of the defendants, and the matters therein contained, are not sufficient in law to bar the plaintiff from having and maintaining his action against the defendants ; but that the defendants have leave to amend their plea within such time as the supreme court may direct, upon payment of the costs upon the demurrer in that court ; and it is further ordered and adjudged, that the plaintiff recover against the defendants his costs in this court to be taxed, and that the record and proceedings be remitted, &c.