Corwin, J.
This is a petition filed by the treasurer of Miami
■county against the Piqua Branch of the State Bank of Ohio, located in that county, alleging the assessment of ^certain taxes .against the bank, under the law of March 21, 1851, which were due .and unpaid, and which the bank refused to pay, and also alleging the ineffectual efforts of the treasurer to collect the taxes, and asking a rule on the bank to show cause why an order should not be had requiring it to pay such taxes. To this petition the bank answered, and the principal matter of controversy between the parties is found in the reason assigned by the bank, against the rule that it was organized and doing business under the provisions of the act of February 24, 1845, which prescribed a different rule and rate of taxation from that provided for in the law under which this tax was assessed ; and that the bank had fully paid the auditor of istate all the taxes for which it was liable under the act of February 24, 1845.
Upon the hearing in the court in common pleas, the rule was discharged and judgment rendered against the plaintiff for costs; from which judgment an appeal was taken to the district court, ■and by that court the cause was reserved for decision here.
The first question for consideration arises upon the motion of *521 defendant to dismiss the appeal; in support of which motion it is •claimed:
1. That the law authorizing the remedy here resorted to is repealed.
2. That the act giving this remedy made no provision for an appeal from the court of common pleas.
In Lessee of Mitchell v. Eyster, 7 Ohio, 257, the court say: “ Where there is no express indication of legislative intention, it is not to be assumed that it was intended by any new enactment to .arrest the regular prosecution of process, essentially remedial, and take away the right acquired under it. Possibly it is competent for the legislative power to do this ; but it is only to be imputed to them when the language they have employed admits of no other interpretation.” And in the case of Henry Debolt, Treasurer, etc. v. The Ohio Life Ins. & Tr. Co. decided at the present term of this -court, the rule laid down in Mitchell v. Eyster is *expressly recognized and approved. It may be considered as settled that where a statutory remedy for a right created by that statute is repealed, but the repealing statute provides a substantially similar remedy, the right may be prosecuted under the repealing statute. And this disposes of the first objection to the proceeding.
2. As to the right of appeal. It is true that the act giving this remedy makes no provision for appeal from the court of common pleas; but it will be observed that this appeal was perfected after the passage of the act of March 23, 1852, “ regulating appeals to the district court,” which fully provides for an appeal to the district court from a final judgment or decree of the court of common pleas in any civil cause of which it had original jurisdiction. If, then, this be a civil cause, of which the court of common pleas had original jurisdiction, and in which the final judgment of said court has been rendered, the right of appeal upon compliance with the terms ■of the statute is complete. And this is so as to all civil causes, whether the action is given by statute or existed at common law.
This brings us to consider the important question made in the •case, whether a banking company, organized under the act of February 24, 1845, “to incorporate.the State Bank of Ohio and other banking companies,” is exempted from any other mode or rate of taxation than that provided for in said act ? The unanimous opinion of this court upon the same question has been fully expressed by my brethren, at the present term, in the cases of The Meenanics’ *522 and Traders’ Branch of the State Bank of Ohio, and the Ohio Life Ins. & Tr. Co., in which it was held that the 60th section of the act of February 24, 1845, contains no pledge, on the part of the state,, not to alter or change the mode or amount of taxation therein specified; but that the taxing power of the legislature over the-property of companies formed under that act is the same as over' the property of individuals ; and that the act of 1851 does not impair any right secured to them by the act of 1845.
*It is wholly unnecessary for me to indulge in any repetition of, or enlargement upon, the views of the. court as expressed in the cases referred to ; and, in the decision of this cause, I shall content myself by adopting, as I do very fully, both the conclusions arrived at, and the reasons by which they were maintained.
But, notwithstanding the points thus decided, receiving the approbation of the whole court, are sufficient to dispose of this controversy, I will not forego the opportunity presented upon a question involving the theory of our institutions, and the existence of free government itself, of declaring, upon my own responsibility, what I conceive to be due to trutb and correct principle, that an incorporation for banking purposes is not a contract, vesting a private right in the persons designated for the accomplishment of those purposes to carry on the business of banking independently of .the sovereignty by which they are appointed. And, instead of being restrained by prevalent opinions of an opposite character, I feel it the more due to myself and to my position so to declare; because an ill-considered and insupportable dictum of one of the-judges of the supreme court of the United States, in the Dartmouth College case, having been eagerly seized by the cupidity of the age, and tolerated by the indifference of the disinterested portion of the legal profession, is now urged upon us as settled law, notwithstanding its conflict with every idea of popular sovereignty, its-disregard of the purposes and objects for which a banking institution is created, its hostility to the legal definition of a contract, and its utter want of support in reason or authority. For it must be remembered that, for the first time in the history of mankind, the-dictum was announced by a single judge in the year 1819, in a case involving no such question, that a bank charter was a private contract. And, although in some of the subsequent reported cases some of the judges of that court have manifested an inclination to adopt that doctrine, yet no court has in fact so. decided; and it *523 must remain for some judicial decision, as yet unborn, to establish, that when *a state or government, in the exercise of one of its sovereign functions and duties, to regulate the currency, appoints an agency, corporate or natural, to aid in the discharge of that duty, a private contract is thereby created with such agent, by which so much of the public sovereignty is parted with, and the agent acquires the irrevocable right to discharge that function, independently of the control and regulation of the power creating it.
To such a doctrine, I not only interpose my unqualified dissent, but maintain that a banking institution is a public institution, appointed for public purposes—never legitimately created for private purposes—its creation proceeding solely upon the idea of public necessity or public convenience, and that, being appointed by the public, solely for public uses, all its operations are subject to the control of that public, who may, from time to time, as the public good may require, enlarge, restrain, limit, modify its powers and duties, and, at pleasure, dispense with its benefits. The agency, during its continuance, is equally independent within its sphere, and upon a modification of its terms unsuited to its pleasure, the agency itself may be renounced and surrendered. So the rights of the agent to the profits and emoluments of the agency, as they may,, from time to time, be prescribed, will be sacredly regarded and enforced by the courts of justice; but, like every other agency, it is revocable at the will of the principal.
In Phillips v. Bury, 2 Term, 352, Lord Holt drew a distinction between such corporations aggregate as are for public government, and such as are for private charity. The former, he said, “being for public advantage, are to be governed according to the laws of the land,” but the latter, “ private and particular corporations of charity, are subject to the private government of those who erect them.”
And in the first book of Blackstone’s Commentaries, page 475, we have a summary of the rights, capacities, and incapacities of corporations at common law. The five incidents to every corporation aggregate are thus defined: 1. To have *succession.' 2. To sue and be sued, plead and be impleaded, grant or receive by a corporate name, and to act as natural persons may act. 3. To purchase lands and hold them. 4. To have a common seal. 5. To make by-laws or private statutes for the better government of the *524 corporate business. These five incidents, therefore, make the corporation, and when made, it is, like a natural person, capable of exercising such trusts and performing such duties as the law may designate.
Our constitution of November 29, 1802, provided for the establishment of cprporations aggregate, and specified the powers, rights, and capacities to which they should be entitled. Section twenty-seventh of Article eighth is in these words : “ That every association of persons, when regularly formed, within this state, and having given themselves a name, may on application to the legislature, be entitled to receive letters of incorporation, to enable them to hold ■estates, real and personal, for the support of their schools, academies,'colleges, universities, and for other purposes.”
I do not propose now to discuss the question, whether it is within the competency of the legislature to grabt any charter, in the absence of an express constitutional provision conferring such legislative power, nor am I disposed to controvert, that under the section ■of the constitution above quoted, some franchises may be delegated to a private corporation, or to an individual; but such delegations were never designed to confer, nor do they confer, any right of property in the corporation or individual; they are made from public considerations alone, and the corporation or individual becomes •only a trustee for the public benefit.
In McCulloch v. The State of Maryland, 4 Wheat. 421, it was urged by counsel, that congress could create no private corporation without the limits of the District of Columbia, because the federal government might thereby engross the powers of the state governments, and that therefore the act to incorporate the Bank of the United States was unconstitutional. But the supreme court answered, that the bank *was a mere agency or instrument of the federal government, created for the public convenience, and not created for the profit or advantage of the stockholders. Mr. Chief Justice Marshall said: “ The power of creating a corporation, though appertaining to sovereignty, is not, like the power of making war, ■or levying taxes, or of regulating commerce, a great substantive and independent power which can not be implied as incidental to other powers, or used as a means of executing them. It is never the end for which other powers are exercised, but a means by which ■other objects are accomplished. No contributions are made to charity for the sake of an incorporation, but a corporation is created *525 to administer the charity; no seminary of learning is instituted in order to be incorporated, but the corporate character is conferred to subserve the purposes of education. No city was ever built with the sole object of being incorporated, but is incorporated as affording the best means of being well governed. The power of creating-a corporation is never used for its own sake, but for the purpose of effecting something else.”
In Osborne v. The Bank of the U. S., 9 Wheat. 738, the late- ■ Charles Hammond, of counsel for the appellants, argued thus : “ The question whether the Bank of the United States as now constituted is exempt by the constitution of the Union from the taxing power of the state, depends upon the nature and character of the institution. If it stands upon the same foundation with the mint and the post office; if its business can justly be assimilated to the process and proceedings of the federal courts, we admit, without hesitation that it is entitled to the exemption which it claims. The states can not tax the offices, establishments, and operations of the national government. It is not the argument of the opinion in McCulloch v. Maryland, but the premises upon which that argument is founded, that we ask the court now to examine and reconsider. Banking is in its nature a private trade, and is a business-in which individuals may at all times engage, unless the municipal law forbid it. Where this is not the case, it is competent for individuals to *contract together and create capital to be employed in lending money, and buying and selling coins, bullion, promissory notes, and bills of exchange. No law is necessary to-authorize a contract between individuals for concentrating capital to be thus employed: nor does the business itself depend upon any special laws for its creation or existence. An association thus-formed may take to themselves a name, and may establish rules and regulations to govern them in the transaction of their business, and to determine their relative rights and duties among themselves. The general law not only recognizes the obligation of this contract-between the parties ; it recognizes also the capacity of the association thus formed to make contracts in the name they have assumed, and the rights of the individuals as joint partners, or one party to enforce their contracts. The whole is a private concern, the capital is private property; the business a private and individual trade, the convenience and profit of private men the end and object.
“ Such is the true character of a bank constituted by individual- *526 ;stockholders. Its rights and privileges, its liabilities and disabilities are all the rights, privileges, liabilities, and disabilities of private persons. ... If, then, a banking association be formed, the capital collected, the mode of transacting the business be settled, and the whole concern regulated and established before any application be made for a charter, it is clear that the mere fact of enacting a law, creating the association a corporation, could not change its character. It was a company of individuals conducting a private trade before it was incorporated, and it retained the same char.acter afterwards. The charter was granted to give facility to the individuals in the management of their private affairs; not that in virtue of that charter they might share in the civil government of the country.”
Mr. Chief Justice Marshall did not evade such an argument, but met it with this answer: “ The foundation of the argument in favor of the right of a state to tax the bank, is laid in the supposed character of the institution. The «argument supposes the corporation to have been originated for the management of an individual concern, to be founded upon contract between individuals, having private trade and private profit for its great end and principal object. If these premises were true, the conclusion drawn from them would be inevitable. This mere private corporation, •engaged in its own business, with its own views, would certainly be subject to the taxing power of the state, as any individual would be; and the casual circumstance of its being employed by the govern men t, in the transaction of its fiscal affairs, would no more exempt its private business from the operation of that power, than it would exempt the private business of any individual employed in the same manner. But the premises are not true. The bank is .not considered as a private corporation, whose principal object is individual trade and individual profit; but as a public corporation, •created for public and national purposes. That the mere business of banking is, in its own nature, a private business, and may be carried on by individuals or companies having no political connection with the government, is admitted; but the bank is not such an individual or company. It was not created for its own sake or for private purposes. It has. never been supposed that congress •could create such a corporation.”
I do not wish to be understood that we approve the conclusion •of McCulloch v. The State of Maryland, nor that of Osborne v. *527 The Bank of the U. S., bnt we can adopt the correct legal propositions which were misapplied to those two cases. We are certain, therefore, that a corporation or an individual to whom a franchise is delegated does not hold it as property, nor as matter of private ■advantage. For although profit may result to the corporators or dhe individual, that is but incidental to the purpose for which the franchise was delegated.
Let us understand clearly what is a francnise. The right to be a corporation has sometimes been called a franchise, but that is a misapplication of terms. The right to create a corporation assuredly is a franchise; so is the right to create *an office, or to ■coin money, or to appropriate private property, or, in England, to take royal fish, to work mines of gold and silver, to take waifs, wrecks, estrays, and treasure trove, to hold courts baron or courts leet, to keep warrens, forests, parks, and chases, and many privileges of the like description. A franchise is a right belonging to the government, as a sovereign, yet committed, in trust, to some officer, corporation or individual. On page 279 of the third volume of Cruise’s Digest, it is said : “A franchise is a royal privilege or branch of the King’s prerogative, subsisting on a subject by a grant from the crown.” It must needs be a sovereign power, or something which no subject or citizen can, of right, use. In England, as is well known, there were cei’tain fish, as whale or sturgeon, to which, when thrown ashore or caught near the coast, the king is entitled. Mines of gold and silver, also, were the king’s property, and part of his revenue. All the game in the kingdom belonged originally to him, as did all waifs, wrecks, estrays, treasure trove, deodands, etc. None but the king, at first, could have a forest, a chase, a warren, or a park. 1 Black. Com. chap. 8th; 3 Cruise’s Digest, title 28, chap. 1. In England, therefore, all such rights, when delegated to a subject, are franchises. But, in this state, any man may take what kind of fish soever he can catch in the public waters, and any man can work, on his own lands, what mines soever may be there. Any man, too, may have a forest, a warren, a chase, or a park, if he wishes, upon his own land; and therefore we have no such franchises. The powers enumerated in the twenty-seventh section of the eighth article of the constitution of 1802 are all of them such as private citizens enjoy of right, and therefore are not franchises. A statutory privilege is not necessarily a franchise; it may Or may not be, according to the char *528 acter of the privilege. A monopoly is not a franchise—it is a> thing disfavored in law, an abuse, a public nuisance.
It is plain that many things are the subjects of a franchise in-England which are not such in this country. The distinction-*will appear by a single example. Any citizen may construct a railroad upon his own land, but no citizen can construct a railroad upon the land of another, without that other’s consent, unless-authorized to do so by law. The right to construct a road over the lands of private citizens, without their consent, is a sovereign right it is the right, so called, of eminent domain. Whenever that right is delegated to a corporation or an individual, by an act of the general assembly, the corporation or individual has & franchise of eminent domain. In England, also, a franchise may become the property of a corporation or an individual. For the king of England is-himself a sovereign; from him, mediately or immediately, are derived all the titles to land, goods or chattels, as well as all private or personal rights. 4 Inst. 363. He can give titles of nobility and honor, can prefer one man to another, can exempt one man or class-of men from the burdens of government. “ At the common law,” says Lord Coke, “ the king, by his prerogative royal, might give-such honor, reputation, or placing to his counselors, and others, his-subjects, as should be seeming to his wisdom.” 4 Inst. 361. The king of England has such power both over the persons and property of his subjects, because he is the source of all honors, offices,, rights, titles, and privileges. 1 J31a. Com. 271, 272, 273.
, Eut, in Ohio, the general assembly can confer no title of nobility, no honor, no irrevocable privilege, which will exempt its possessor from the equal and uniform operation of our laws. It can not even confer an emolument, privilege, or honor, in hereditary succession. Our government is founded upon that sublime truth, acknowledged-in both our present and old constitutions, as well as in the Declaration of Independence, that all men are created free and equal, and that every exemption, immunity or privilege, is an invasion of the-primordial estate and natural rights of other citizens. Whenever, therefore, a franchise is conferred upon a corporation or an individual, nothing but the public good is to be considered; the private-advantage which may result to the *corporation or individual is but incidental to the chief object, and can not ripen into a right of property.
The best illustration of this, perhaps, will appear by comparing- *529 the nature of an office in England and an office in America. An office, like a franchise, is a royal gift: it is considered property in England. Some offices are estates in fee simple or feetail; some, estates for life; and some only estates at will. Cruise’s Digest, vol. 3, title 25. There are some offices, also, which are said to be estates for a term of years, or for one year. And ministerial offices may be granted in reversion, or to commence at a future period. Some-offices are even assignable by deed. But, in America, a public officer is only a public agent or trustee, and has no proprietorship or right of property in his office. It is true that in The State v. McCollister, 11 Ohio, 50, Judge Hitchcock said, that an officer had “ a vested right” in his office, but that dictum is opposed to many- and well considered authorities. Butler v. The State of Pennsylvania, 10 How. 402. The State v. Dens, Charleton, 397. The Commonwealth v. Bacon, 6 Serg. & R. 322. The Commonwealth v. Mawe, 5 Watts & S. 418. The Commonwealth v. Clark, 7 Watts & S. 127. Barker v. The City of Pittsburg, 4 Penn. St. 51.
It is true, that an officer elected by the legislature, or the people, can not be expelled from his office, arbitrarily, by a resolution or act, because the constitution prescribes an impeachment, or other mode of trial for such cases; but if the office be created by the legislature, it may, in the absence of express constitutional restriction, be abolished or suspended; and yet the officer can not claim compensation for the loss of -his office. He has no property or individual right in it. He is but a trustee for the public; and whenever the public interest requires that the office should be abolished, or the duties of the office become unnecessary, the -.incumbent can not object to the abolition of the office.
That franchises are conferred for the public good alone is evident from another consideration. The fourth section *of the eighth article of the constitution of 1802 declared that “private property ought, and shall ever be held inviolate, but always subservient to the public welfare, provided a compensation, in money, be made to the owners.” The legislature can not authorize private property to be taken for private use, with, or without compensation. This would be clearly unconstitutional. McArthur v. Kelly, 5 Ohio, 149, 150. Taylor v. Porter, 4 Hill (N. Y.) 147, 148.
If, therefore, a railroad company be a private corporation, how can the legislature justify itself in conferring the franchise of eminent domain—in authorizing the appropriation, in invitum, of pri *530 vate property, for merely private purposes ? This question was considered and discussed by Chancellor Walworth in Beekman v. The Saratoga & Schenectady R. R. Co., 3 Paige, 73, 74, when he said : “ The right of eminent domain does not, however, imply a right in the sovereign power to take the property of one citizen, and transfer it to another even for a full compensation, where the public interest will be in no way promoted in the transfer. . . . Upon the principle of public benefit, not only the agents of the government, but also individuals and corporate bodies have been authorized to take private property for the purpose of making public highways, turnpike roads, and canals ; of erecting and sustaining wharves and basins, of establishing ferries, of draining swamps and marshes, and of bringing water to cities and villages. In all such cases, the object of the legislative grant of power is the public benefit derived from the contemplated improvement, whether .such improvement is to be effected directly by the agents of the government, or through the medium of corporate bodies or individual enterprise.”
In the case of Bloodgood v. The Mohawk & Hudson R. R. Co., 18 Wend. 13, the chancellor reiterated and enforced the same propositions. And in Cotrill v. Myrick, 3 Fairfield, 222, the supreme court of Maine say: 11 If public purposes and uses were to bo promoted, as they undoubtedly were in the case before us, it was no objection to the power *of appropriation by the legislature, that it contributed also to the emolument or advantage of individuals or corporations.”
I am fully cognizant of what was said by the judges of the supreme court of the United States in Dartmouth College v. Woodward, 4 Wheat. 518. The chief justice said that Dartmouth College was a private corporation, and that “the circumstances of that case constituted a contract.” But a college is an eleemosynary ■corporation, and is expressly distinguished by Lord Holt from corporations which are “ for public advantage.” The chief justice did not, however, even say that the charters of private corporations were contracts; Mr. Justice Story did say so, and perhaps the language of Mr. Justice Washington would extend that far; but those two judges delivered opinions for themselves and not for the court. I might, if it were necessary, draw a clear distinction between the •charter granted to Dartmouth College by the king of England, and *531 a charter granted by onr legislature ;■ but that would lead me too far from my present purpose.
Mr. Justice Story said also, that a bank was a private corporation, and for the reason that its stock is owned by private persons. But, as we have seen, where that very reason was urged at the same term to show that congress could not create a bank without the limits of the District of Columbia, the supreme court, speaking by the chief justice, said that the nature of the business, whether public or private did not determine the character of the corporations. McCulloch v. The State of Maryland, 4 Wheat. 411. And even the opinion of the court delivered by the chief justice in Dartmouth College v. Woodward, 4 Wheat. 638, is opposed to this dictum of Mr. Justice Story. “ The character of civil institutions,” says the chief justice, “ does not grow out of their incorporation, but out of the manner in which they are formed, and the ob jects for which they are created. The right to change them is not founded on their being incorporated, but on their being instruments of government created *for its purposes. The same institutions, created for the same objects, though not incorporated, would be public institutions, and, of course, be controlled by the legislature. The incorporating act neither gives nor prevents this control.” And when the same reason was again urged, long afterward, to show that the Bank of the United States could be taxed by the state governments, the chief justice, speaking for the court, said: “ The bank is not considered as a private corporation, whose principal object is individual trade and individual profit, but as a public corporation, created for public and national purposes. . . It was not created for its own sake, or for private purposes.” Yet much the larger number of the shares of the stock of the Bank of the United States were owned by private persons.
It is plain, therefore, that even if banking were a private business, a bank would not, necessarily, be a private corporation. But banking is no more a private business, certainly, than making a railroad or a turnpike, and yet, when they are made, in virtue of a franchise of eminent domain, the corporations are public corpora* tions. For how, otherwise, I repeat, could the legislature authorize them to appropriate private property, without the consent of the owners? Is it true, however, that banking is a private business? I do not mean merely the purchase and sale of bullion and bills of exchange, the discount of promissory notes and other obligations, *532 and the receiving of money on deposit. Those are things which any citizen may do ; they require no permission from government,, nor is the right to transact them a franchise. I use the term “ banking ” in the sense of our statutes—the business of issuing promissory notes, bills, or certificates, to circulate as money. That is-what no citizen can, of right, do. He may give his promissory note, bill of exchange, check, or certificate of deposit, to any person who is willing to take it; and it may even pass from hand to-hand, upon his reputation for ability and readiness to discharge his obligations. But a bank bill is something different; it circulates promiscuously, without much regard to or ^knowledge of the bank’s solvency or willingness to redeem, and, generally, because it is a bank bill. Our statutes distinguish between a bank bill and a promissory note ; and in all the usages and transactions-, of life a still more marked distinction appears. A hank bill is designed to perform the office of money, and does perform that office.. No citizen can issue such a bill without permission from government he is punishable by indictment and fine for doing so. The right, to coin money, or, what is in effect the same, to issue bills, notes, and obligations, to circulate as money, is a sovereign power.
It may well be doubted whether such bills, notes, or obligations, are not hills of credit, and the state authority, as to them, within the interdict of the federal constitution. A distinguished American jurist has justly said: “State incorporated banks are a novelty, wholly unforeseen by the constitutions—a vast fungus, grown upon government, upon property, upon liberty, and equality, by which the common welfare is thoroughly affected, and the currency,, more than two-thirds of it, engrossed. The power to make currency is a sovereign power. Even granting that a state may farm out or depute such authority, it must have—it can not alienate—the right to regulate and control.”
If the power of the state to delegate such authority be admitted,, still it is a delegation in trust of an admitted branch of sovereignty, and such a franchise must necessarily be conferred, from public considerations alone, and because it is supposed to be for the public interest. A corporation established upon such a consideration, and for such a purpose, must needs be a public corporation. In The State v. The Commercial Bank, 10 Ohio, 539, Judge Lane said: “A bank of circulation is created to provide, by its credits, a currency which may serve as money; and whenever this currency becomes *533 discredited, irredeemable, inconvertible, so that it no longer fulfills this end, there is a misuser of its powers, such as, upon common law principles, may work a forfeiture.”
*1 maintain, as to any and all corporations created with exemptions from common liabilities, that their creation and existence are in violation of the first principle of equality in property. And when the legislature authorizes privileged individuals, as a bank, to make currency, it grants what belongs to the public. The resumption of which privilege by the public, without taking the chattels of the bank, affects no property, impairs no contract, infringes no right, but merely restores to its proper place so much of popular sovereignty as was claimed by a grant of questionable authority, and in clear derogation of common right.
But, as respects companies organized under the act of February 24, 1845, “ to incorporate the State Bank of Ohio and other banking companies ”—that they are essentially public in their character is too clear for dispute. That act is, in one sense, a general law. It divided the state into twelve banking districts, and prescribed the number of companies to be established, as well as the amount of capital to be employed in each district. It required certain officers of the state government to take part, as well in the organization as in the continued management of the system; It was in every sense an act to authorize and regulate “banking” as a public business. There is no act to divide the state into districts, by ■counties or otherwise, for agricultural, mechanical, manufacturing, or mercantile purposes; such an idea never occurred to the legislature. I apprehend no satisfactory reason can be assigned why banking under that act should be restricted by districts, or by the number of companies, or by the amount of capital employed, to be ■organized and regulated in part by officers of the government, unless it was designed to be a public business.
It may, therefore, be declared that the Piqua Branch and all other companies organized under the act of February 24,1845, are public corporations, created for public purposes, and subject to the emergencies of public necessity or policy, as declared from time to time by the legislature. That the charters of such corporations may be repealed or altered ^without the consent of the corporators was admitted by all the judgeB in the Dartmouth College ■case, and is established by many other authorities. Terrel v. Tay *534 lor, 9 Cranch, 43 ; The Town of Marietta v. Fearing, 4 Ohio, 427; The People v. Morris, 13 Wend. 325.
Inasmuch as the reasons assigned by the defendant against the rule sought do not contest the regularity of the assessment of the-tax, under the law, judgment may be entered in favor of the plaintiff for the amount of the tax so assessed, with five per cent, penalty and interest from the time the same was payable, and the cause-may be remanded to the district court for execution.